ROSEMARY LEDET, Judge.
11 This is a criminal appeal.'- Darryl Griffin, the defendant, appeals his conviction and sentence for attempted second degree murder. For the reasons that follow, we affirm.[1]

STATEMENT OF THE CASE

On July 11, 2008, the State filed a bill- of information charging Mr. Griffin with attempted second degree murder, a violation of La. R.S. 14:30.1 and 14:27, and possession of a firearm by a convicted felon, a violation of La. R.S. 14:95.1. On July 17, 2008, Mr. Griffin was arraigned; and- he pleaded not guilty. On July 20, 2009, the district court found probable cause for the attempted second degree murder charge. At that time, the State announced that it was planning to proceed to trial on the attempted second degree murder charge and that it was “severing out the 95.1 [possession of a firearm by a convicted felon] charge.”
During a pretrial conference, defense counsel allegedly learned that, despite the State’s previous stipulation to try the charges • separately, the State planned to try the charges together. Mr. Griffin immediately filed a motion to quash or to sever the counts for-trial,, which the district court denied.” This court denied Mr. Griffin’s writ application. State v. Griffin, 11-0329 (La.App. 4 Cir. 5/12/11) (unpub.). Granting Mr. Griffin’s writ application, the Louisiana Supreme Court ruled as follows:
In open court, a prosecutor stipulated that the gun charge and the attempted murder charge could not be tried together. Acting on that stipulation, the trial court ruled that the charges were severed. Although this case was transferred to a different division of the trial court and a different prosecutor was then assigned, the newly assigned prosecutor and the trial court were bound by. the court’s prior ruling.... Therefore, based on the unique facts of this case, *564 we find that the trial court erred when later ruling that the gun charge and the attempted murder charge could-be tried together..
State v. Griffin, 11-1227 (La.6/29/11), 65 So.3d 648.
Commencing on January 18, 2012, a three-day jury trial was held on the attempted second degree murder charge. The jury found. Mr. Griffin guilty as charged. On January 11, 2013, the district court denied Mr. Griffin’s motion for new trial. On that same date, the district court held the sentencing and habitual offender hearing and adjudicated Mr. Griffin a third-felony habitual offender. The district court sentenced Mr. Griffin to forty years at hard labor, without benefit of probation or suspension of sentence; the district court immediately vacated the Isoriginal sentence and resentenced Mr. ■ Griffin as a third-felony habitual offender to forty years at hard labor, without benefit of parole or suspension of sentence. Defense counsel orally objected to the sentence. This appeal followed.[2]
On May 26, 2015, the State filed a motion to supplement the appellate record with the victim’s medical records from the treatment for his gunshot wounds. As the State alleges in its motion, a copy of these medical records was introduced at trial for record purposes only. These medical records will , assist this court in determining an issue Mr. Griffin raises on appeal— whether the district court’s decision to exclude certain evidence denied Mr. Griffin’s right to present a defense. Accordingly, we grant- the State’s motion to supplement the appellate record.[3]

STATEMENT OF THE FACTS

For ease of discussion, we divide our analysis of the facts into the following three sections: the witnesses’ accounts of the shooting, the officers’ investigation of the shooting, and the other evidence.

The witnesses’ accounts of the shooting

Mr. Griffin was convicted of the May 11, 2008 attempted second degree murder of Alphonso Warner, who was shot eight times. At trial, two people testified that they witnessed the shooting — the victim, Mr. Warner, and Keith Knatt. Another witness — Keith Knatt’s mother, Kimberly (“Kim”)' Knatt — | Justified regarding details of the shooting.[4] Mr. Warner testified for the State; Keith and Kim Knatt testified for the defense. The testimony of these three witnesses is summarized below.
Alphonso Warner’s Testimony
Mr. Warner testified that in 2006, in the aftermath of Hurricane Katrina, he moved to New Orleans to help rebuild the city. He testified that he does construction and mechanical work. At the time of the shooting, he was employed doing construction work. Only a few weeks before the shooting, he was released from-jail.[5]
*565 The shooting occurred at about 12:30 a.m. on May 11,2008. On the afternoon of May 10, 2008, Mr. Warner was dropped off from his construction job near his house. His house was located close to the intersection of Clara and Cadiz Streets; Keith Knatt and his mother, Kim Knatt, lived around the corner from him.[6] According to Mr. Warner, when he was dropped off from work that afternoon, he was greeted by Keith Knatt, who was sitting on the Knatts’ front porch with two other men. Keith Knatt called Mr. Warner over and asked him to borrow some money. Mr. Warner gave Keith Knatt ten of the fifteen dollars in cash that he had on him.
|sWhen Mr. Warner was giving Keith Knatt the money, Mr. Griffin — whose nickname is “Dizzy” — drove up in a burgundy-colored sport utility vehicle (“SUV”), either a Ford Explorer or Chevy Blazer-type of vehicle. Although Mr. Warner had seen Mr. Griffin in the neighborhood, he did not know his name. Mr. Griffin saw Keith Knatt putting the money Mr. Warner had given him into his pocket, and Mr. Griffin said that he too needed some money. Mr. Warner replied that he did not have any money and that “this” was all the money, he had — presumably the five dollars left after he gave Keith Knatt ten dollars.
According to Mr. Warner, Mr. Griffin also asked Keith Knatt if he knew anyone who had powdered cocaine; Keith Knatt responded that he did not. Mr. Griffin then began talking 'about drinking and having a party. Mr. Griffin asked Keith Knatt who Mr. Warner was; Keith Knatt replied that- Mr. Warner was his friend “Reggae” from New York. Mr. Griffin then began talking about New Orleans versus New York; he stated that “New York ain’t shit.” When Mr. Warner asked him why, Mr. Griffin replied that “[bjecause New Orleans got the number one murder rate and New York ain’t doing nothing like that no more.” Mr. Warner asked Mr. Griffin if that was something he was proud of. Mr. Warner, Mr., Griffin, and the other, people present discussed the good and bad between New Orleans and New York. During this discussion, Mr. Warner said something about New Orleans holding down the South, while New York is holding up the North. ■
After Mr. Griffin left, Mr. Warner, Keith Knatt, and two other men walked to a store to purchase -one forty-ounce Olde English malt liquor. Approximately thirty or forty minutes later, they returned to the Knatts’ porch. They sat on the Knatts’ porch talking and sharing the one beer and one marijuana blunt with- Kim Knatt. Eventually, Kim Knatt went inside; the other two men left; and only Mr. | (¡Warner and Keith Knatt were left on the porch. Later, Keith Knatt went inside; and Mr. Warner began walking to his house around the corner.
Before • Mr. Warner reached his' house, Mr. Griffin pulled up in the burgundy SUV and exited the vehicle. ' According to Mr. Warner, Mr. Griffin began walking toward him around the back of the SUV and stating: “Hey, New York, let’s kick it about New York and New Orleans some more.” Mr. Warner replied that he was tired, that he had been drinking[7] and smoking, that *566 he had to go work in the morning, and that “[w]e can kick it tomorrow.” At that point, Mr. Griffin hugged Mr. Warner and shot him. Mr. Warner said he tried to push Mr. Griffin off and run, but he could not run because he had been shot three times in his pelvis. He managed to move a short distance away, but Mr. Griffin shot him five more times — three times in his side, once in his shoulder, and once in his chest. The bullet that hit him in his shoulder spun him around, and the one that struck him in his chest caused him to fall and strike his head on the sidewalk. Mr. Griffin approached him, went into his pocket, and took his wallet. After someone called out “Hey, yo,” Mr. Griffin took off running.
While Mr. Warner was lying on the ground, he saw illumination from a vehicle’s headlights and raised his hand to catch the driver’s attention. The vehicle pulled up, and he could hear a police officer talking into his radio. The officer approached Mr. Warner and asked him what happened. He told the officer that he 17had been shot. The officer asked him who shot him, and he told the officer that he did not know. The officer asked him his name, and he told him. The officer asked him a second time who shot him. He told the officer to sit him up and he would tell him whatever he wanted to know. Mr. Warner, however, testified that he could not remember anything else until he woke up in the hospital. He further testified that he did not remember talking to an officer or a detective at the hospital on the day he was shot.
After he came out of a coma, which was several days later, Mr. Warner remembered talking to police officers at the hospital and viewing a photographic lineup. He also remembered that there were two officers present at that time and that he was on morphine.[8] The officers asked him if he could recognize the person who shot him. Mr. Warner remembered picking out Mr. Griffin’s photograph. He said that the photograph depicted how “Dizzy” looked on the night he shot him. He testified that he could “recognize him [Mr. Griffin] anywhere in anything. And that’s the face I see every night. I see him in my dreams.” He testified that when he .goes to bed he prays before going to sleep that he not think about Mr. Griffin.
Mr. Warner explained what he meant when he told the first officer on the scene — Captain Hargrove — that he did not know who shot him. He explained that he did not know the individual’s given name; however, he did know, at that time, the nickname of the person who shot him. Mr. Warner replied in the affirmative when asked whether it was possible he spoke to someone at the hospital but that he lasimply did not remember. He noted that after he came to, nurses mentioned things suggesting that he had said things to them of which he had no recollection.
*567 Mr. Warner also explained his testimony about when Detective Hurst came to the hospital and showed him the photographic lineup. He testified that before the officers showed him the photographic lineup or told him what was going on, they asked him what happened. He told them he was shot by someone he believed was named “Dizzy.” The officers then asked him about the shooter’s description, what type of vehicle he had been driving, “arid so forth.” The officers, at that point, presented him with the photographic lineup. After he identified Mr. Griffin, they explained to him how they had identified Mr. Griffin as a suspect. Mr. Warner denied ever seeing the handgun that Mr. Griffin used to shoot him.
At trial, Mr. Warner identified his wallet, his shoe, his work shirt, and his work jeans. He also identified Mr. Griffin in court as the person who shot him.
Keith Knatt’s Testimony
According to Keith Knatt, Mr. Warner came over to his house around 4:30 p.m. on the day of the shooting. Keith Knatt denied calling Mr. Warner to come over. At that time, Mr. Warner was drinking a forty-ounce Olde English beer. They hung out together and talked on the Knatts’ porch. Afterwards, they went to the store to purchase more beer; Keith Knatt described it as “a lot” of bottles • of beer. Around 6:00 p.m., they returned to the Knatts’ porch; and they stayed there drinking until Mr. Warner decided to go home.
Keith Knatt’s version of the shooting was as follows:
Q: Alright sir, Please tell this Jury your story?
A: Well, we was sitting on the porch and we was drinking and it was ‘round 10:00, ‘round that time, he [Mr. Warner] was ready to go, but he was drunk. And he was just talking smack to somebody he | pdidn’t even much know. And he was saying how he was from New York, and he know this and he know how to do that. So, you know, he felt played, dude, I don’t know. I really don’t know really what happened, but I know I was there and the dude shot him and it wasn’t Darryl [Griffin].
Q: Okay, the person that he went and talked to initially when he first Started leaving the house, wasn’t Darryl? .
A: No.
Q: Alright. He talked to him, did that person after they first spoke, shoot him ■immediately? '
A: No. They talked for a minute, then the dude shot him.
Keith Knatt further testified that he was an eyewitness to .the shooting and that he witnessed it from his porch. When further asked if Darryl Griffin shot Mr. Warner, Keith Knatt replied in the. negative. When asked whether he had ever told the police about observing the shooting, Keith Knatt again replied in the negative. He testified that the police were down the street the whole time. He also testified that he was scared. He confirmed that Mr. Griffin was around “there” that night, but he maintained that Mr. Griffin did not shoot the victim. When asked whether, at any time in the last four years, any member of Mr. Griffin’s family came forward and asked him to go to the district attorney’s office to tell them what happened, Keith Knatt once again replied in the negative. He denied being afraid of Mr. Griffin.
Kim Knatt’s Testimony
On the day of the shooting, Kim Knatt testified that Mr. Warner arrived at her house around 6:30 p.m.; she stated that he was. hanging out and drinking there. When asked how much he. had to drink, she replied that he drank “a lot of beer.” *568 She admitted that she drank beer with Mr. Warner and' Keith Knatt; -she denied smoking marijuana with them. Kim Knatt replied in the negative when asked | inwhether, when she was sitting on the porch drinking, Mr. Griffin asked for any drugs. She said that Mr. Griffin was hanging out with Keith Knatt. When asked whether Mr. Griffin was hanging out with Mr. Warner and her son, Kim Knatt . said that “everybody” was out there. She denied hearing Mr. Warner and Mr. Griffin get into any arguments that day,
Kim Knatt recalled that the shooting occurred around 1:00 a.m. Although she did not witness the shooting, she testified that she heard the shots. She explained that she had walked down Clara Street to get her daughter, and she heard the shots while walking up some stairs a couple of houses away to knock on a door. She ducked and did not know where the shots came from. She stayed down for a minute or so, knocked on the door, and called her daughter to come out. When she returned to her house, she saw Mr. Warner lying on the ground. She did not see any vehicle speéd past her on the why back to her house. She testified that there were people on her street when she walked down to get her daughter. When she and her daughter returned home, she went inside. By the time she came back out an ambulance was there.
On the day after the shooting, Kim Knatt went to the hospital to visit Mr. Warner. She described him as alert. He told her that it was his birthday, and she wished him Happy Birthday. According to Kim Knatt, he then made the following statement to her: “Ms. Kim, Dizzy didn’t shoot me, do you know who shot me — .” The State objected to this testimony on the ground of hearsay. The district court sustained the objection. Ms. Knatt testified that she and Mr. Warner continued to talk “about other stuff,” but they did not talk about the shooting anymore.
Kim Knatt acknowledged that she nei-thér talked to the police nor anyone else about the shooting before giving her testimony at trial. No police officers or Indetectives ever knocked on her door to ask her what happened. Nor did any of Mr. Griffin’s family come to talk to her about the shooting.

The officers’ investigation of the shooting

The trial testimony of the various officers involved in the investigation is summarized below.
Captain Simon Hargrove’s Testimony
New Orleans Police Department (“NOPD”) Captain (then Lieutenant) Simon Hargrove was the officer who found Mr. Warner lying on the ground. When the shooting occurred, Captain Hargrove was working a paid detail at Baptist Hospital. He was near a small security shack in the 4400 block of Clara Street when he heard what sounded like multiple gunshots. To investigate, he went toward the sound of the shots, which he estimated had been fired one-half to two blocks away. As he proceeded in that direction, he spotted a fast moving maroon or burgundy SUV. He explained that the SUV was moving faster than normal for that residential area. He noticed no other persons or moving vehicles in the area. Captain Hargrove called in a report of gunshots and gave a description of the SUV. He then noticed a bicycle in the 4600 block of Clara Street and saw a male victim on the ground. The victim was suffering from multiple gunshot wounds.
• According to Captain Hargrove, he called for emergency medical service (“EMS”) and then attempted' to calm the victim down. He asked the victim if he knew who shot him. The victim gave him *569 the name “Diddy, Dizzy, something of'that fact.” Captain Hargrove then asked the victim if he knew the person; the victim replied that he knew the person from the neighborhood — “around the way.” • The victim did not mention that the person who shot him drove off in a vehicle. Captain Hargrove shared this information with NOPD officers. Captain Hargrove 112testified that he would have told the lead investigating detective — NOPD Detective Robert Hurst — as well as the initial officer on the scene — NOPD Officer Michael Bre-kalo — that the victim told him someone with the name of “Diddy” or “Dizzy,” or something like that, shot him.
Sergeant Sam Palumbo’s Testimony
On the day of the shooting (May 11, 2008), .NOPD Sergeant Sam Palumbo was on duty. At around 12:30 a.m., he responded to a shooting call in the 4600 block of Clara Street. When he arrived, EMS was taking the victim to the hospital; thus, he did not speak to the victim on the scene. He was assigned to go to the hospital, speak to the victim, and retrieve the victim’s clothes. About an hour after the shooting, he did so. At the hospital, Sergeant Palumbo spoke.to the victim as he was being moved on a gurney into surgery. The victim told him that an individual he knew from the area by the nickname “Dizzy” had shot him. Sergeant Palumbo acknowledged that he knew who “Dizzy” was from previous encounters with him. Although Sergeant Palumbo questioned the victim further, the victim did not provide any other information. Sergeant Palumbo did not recall the victim saying anything about a vehicle.
Later that same night, at about 10:00 p.m., Sergeant Palumbo and Detective Hurst were patrolling the area where the shooting occurred together. At that time, the. officers observed Mr. Griffin driving a maroon Chevrolet Trailblazer.[9] The officers were in a police vehicle.-on Willow Street when Mr. Griffin drove past the front of the police vehicle on Upperline Street. The driver’s side of the Trailblazer |13was toward the front of the police vehicle, and Sergeant Palumbo testified that the driver’s window was down. When the Trailblazer passed by them, the officers turned behind the Trailblazer in an attempt to stop it. The' Trailblazer increased its speed and turned onto Robert Street. The officers activated the police vehicle’s lights and siren, but the Trailblazer drove the wrong way up Robert Street and crossed South Claiborne Avenue. Thé officers were unable to follow the Trailblazer due to traffic bn South Claiborne Avenue. The officers observed that the Trailblazer did not have a license plate.
About' thirty minutes later, the officers spotted the Trailblazer by the pumps at a gas station at the corner of South Broad Street and Washington Avenue (the “Gas Station”). No .one was in the Trailblazer. The keys .were in the engine, and the motor was running. The officers observed Mr. Griffin walking from the vicinity of the Trailblazer and talking to two men. The officers pulled up and detained the trio— Mr. Griffin and the two men. Sergeant Palumbo went inside the Gas Station and viewed video footage taken by an outside surveillance camera to determine what occurred before the officers arrived. In the video, he observed Mr. Griffin drive the Trailblazer into the Gas Station. He observed Mr. Griffin exit the driver’s side *570 door and the two other men exit the other doors.
Another officer who had responded to the scene, Officer John Castelin, went over to the Trailblazer, which was still running, to check it. Through the driver’s side window, he saw a handgun stuck between the driver’s seat and the center console. He was able to see the gun through the passenger side window as well. Officer Castelin told Sergeant Palumbo that he observed something in the Trailblazer. Sergeant Palumbo retrieved and seized the handgun. Sergeant Palumbo confirmed that he was able to see from outside the vehicle the handgun stuck |ubetween the driver’s seat and the center console. Sergeant Palumbo also confirmed that he did not see the handgun until after an individual other than Mr. Griffin had reentered the Trailblazer and moved it. Sergeant Palumbo replied in the negative when asked whether anyone ever came to pick up the Trailblazer. He also testified that it was not determined until the following day that the Trailblazer was stolen.
At trial, Sergeant Palumbo identified the Gas Station video, which was played for the jury. Sergeant Palumbo also identified the handgun he found in the Trailblazer. There were nine live cartridges in the handgun at the time it was seized. Sergeant Palumbo testified that the live cartridges found in the handgun had green casings. He noted that he personally had not come across green handgun cartridge casings very often in the hundreds of gun seizures he had made.
Defense counsel asked Sergeant Palum-bo whether he had arrested Mr. Griffin for a traffic violation; he replied: “For a traffic violation, as well as being a felon in possession of a firearm.”[10] Sergeant Pa-lumbo testified that he did not arrest the other two men who had exited the vehicle in the Gas Station.
Detective Robert Hurst’s Testimony
Detective Robert Hurst’s testimony tracked that of Sergeant Palumbo as to the officers’ spotting Mr. Griffin driving the Trailblazer, the officers’ efforts to stop Mr. Griffin, Mr. Griffin’s evasion of the officers, and the officers’ subsequent apprehension of Mr. Griffin at the Gas Station. Detective Hurst added that he wrote Mr. Griffin a citation for three violations— no license plate, no driver’s license, and reckless operation.
I ^Detective Hurst confirmed that he spoke to Captain Hargrove at the scene of the shooting. He further confirmed that he learned the name of the shooter from Captain Hargrove was “Dinty” or “Dizzy”; and from Sergeant Palumbo, “Dizzy.” As a result, he developed Mr. Griffin as a suspect for the crime. Detective Hurst explained that he was “very familiar” with Mr. Griffin and that he previously had numerous interactions with him. He testified that he once bought Mr. Griffin a beer at the Bon Ton Restaurant. He, however, characterized his previous interactions with Mr. Griffin as minor. Detective Hurst testified that the officers conducted a canvas of the block where the shooting occurred and met with negative results. He acknowledged that he did not speak to Keith or Kim Knatt, or anyone else who lived in the block.
Detective Hurst testified that the victim was finally well enough to talk with him on the detective’s fifth visit to the hospital. He said the victim was still in a considerable amount of pain,[11] but the victim was in *571 a clear state of mind. Detective Hurst interviewed the victim to get his recollection of the incident and a description of the person who shot him. The victim named the person who shot him as “Dizzy” and provided a description of the person who shot him that closely resembled Mr. Griffin — approximately six feet tall, medium complexion, medium length dreadlock hairstyle, with a thin beard. Detective Hurst thus elected to show the victim the six-person photographic lineup that he had prepared. The victim immediately identified Mr. Griffin’s photograph. Detective Hurst testified on cross examination that he did not inform the victim about Mr. Griffin before he | ^presented him the- photographic lineup, nor did the detective tell the victim that Mr. Griffin had been arrested until after the victim made a positive identification.
Detective Hurst, recalled as a defense witness, was questioned as to his supplemental report. He confirmed that his supplemental report reflected that when he talked to the victim at the hospital, the victim described the weapon used to shoot him as a black semi-automatic handgun; and the victim mentioned a small maroon or burgundy SUV.
Detective John Castelin’s Testimony
NOPD Detective John Castelin testified that when he arrived at the Gas Station, Sergeant Palumbo and Detective Hurst were interviewing someone. He approached a vehicle with its engine running and lights on,[12] illuminated the interior with his flashlight, and observed a handgun between the center console and the driver’s seat. He advised Sergeant Pa-lumbo of his discovery, and Sergeant Pa-lumbo recovered the handgun. Detective Castelin identified the Hi-Point handgun introduced in evidence as the one recovered. that night because it was very worn, more so than other Hi-Points he had recovered.
Detective Castelin was shown parts of the Gas Station video. Based on the hairstyle, Detective Castelin testified that the individual who exited the driver’s seat of the vehicle looked a little like Mr. Griffin. Detective Castelin noted that he had dealt with Mr. Griffin before. He admitted that the face on the video was blurry and that he could not tell for certain it was Mr. Griffin.
Officer Michael Brekalo’s Testimony
InNOPD Officer Michael Brekalo, testifying for the defense, stated that he came to the crime scene to handle the police report. When he arrived, the victim already had been transported to the hospital. He remained on the scene until the Crime Lab finished processing it and the fire department finished cleaning it. Officer Brekalo estimated that he was at the crime scene one or two hours. He then relocated to the hospital. A physician informed him that the victim was not available to speak to him. He never saw the victim at the hospital.

The other evidence

The State introduced a blown up map of the crime scene and the general neighborhood of the crime scene.
New Orleans EMS Paramedic Rebecca Powell identified the “Prehospital Run Report” with her signature and badge number on it. The report reflected a “34-S”— *572 a shooting incident — ón May 11, 2008, in the 4600 block of Clara' Street. The call was received at 12:38 am., and it involved a victim with multiple gunshot wounds to his chest and abdomen. The report ihdi-cated that the victim was found on the ground; and the victim was conscious and alert. Paramedic Powell testified that the victim’s wounds were “serious, potentially life-threatening,' though he appeared to be stable at the time.” The victim admitted having consumed some alcohol, and he suggested “a little” drug, usage. Paramedic Powell stated that nothing in the report reflected that the victim said anything about who shot him.
NOPD Crime Scene Technician Shaheed Muhammad identified the photographs he took of the crime scene and the report he prepared. He identified on-the-scene photographs of multiple spent cartridge casings and two spent bullets — items he collected 'as evidence and identified in court. Technician |]SMuhammad did not have a personal recollection of investigating the Crime. His report, which correlated with the photographs, was the basis of his testimony.
Troy Dickerson, a Senior Forensic Examiner with the NOPD Crime Lab, identified the 9mm Hi-Point handgun he processed for fingerprints. He found none. He testified that he had processed hundreds of weapons for fingerprints and that he actually recovered fingerprints only a few times.
Retired NOPD Sergeant Byron Win-bush (“Sergeant Winbush”) was qualified, over defense objection, by the district court as an expert in the field of ballistics and firearms identification. He identified the two reports that he prepared. One report reflected that a comparison microscope examination established two things: (1) that the two 9mm diameter spent bullets recovered at the crime scene, which had eight lands and grooves, had been fired from the same firearm; and (2) that the five spent 9mm cartridge casings had been fired in the same firearm.
The other report reflected that Sergeant Winbush test fired the 9mm Hi-Point handgun recovered at the Gas Station from the Trailblazer and that he recovered one sample test-fired spent bullet and one spent cartridge casing. He compared the test-fired bullet to the two spent bullets recovered from the. crime .scene, but he was unable to determine if they were fired from the same firearm. He explained that the two bullets recovered from the crime scene had “like” rifling characteristics to the 9mm Hi-Point handgun. Although the barrel of the 9mm Hi-Point handgun had eight right lands and grooves and one of the bullets had eight right lands and grooves, there were not enough striation marks on the test-fired bullet to make a determination whether the two bullets recovered from the crime scene were fired by that particular Hi-Point 9mm handgun. Similarly, he was unable to determine 119whether the five spent cartridge casings recovered from the crime scene had been fired in that Hi-Point 9mm handgun.
Sergeant Winbush testified that Hi-Points are one of the few firearms that have eight right lands and grooves. He confirmed that he could say with “some certainty” that the two spent bullets from the crime scene were fired from a Hi-Point 9mm firearm. Given that the tw;o spent bullets recovered from the crime scene had eight lands and grooves, he said the “possibility exists” that the two spent bullets from the crime scene were fired from the 9mm Hi-Point handgun in evidence. Sergeant Winbush testified that although he was not able to closely match the Hi-Point handgun seized from the Trailblazer: as the one used to shoot the victim, he was not able to exclude it.

*573
DISCUSSION

Assignment of Error Number One
In his first assignment of error, Mr. Griffin asserts that the district court abused its discretion in refusing to allow a defense witness (Keith Knatt) to testify about where Mr. Griffin was standing at the time of the shooting. He asserts that the district court erred in concluding that such testimony should be excluded because of the failure to provide notice of an alibi defense pursuant to La. C.Cr.P. art. 727.[13] Mr. Griffin contends that Keith Knatt’s proposed testimony did not amount to an alibi defense.
12f|The record does not reflect that defense counsel sought to present Keith Knatt’s proposed testimony. Nor does the record reflect that the district court ruled such testimony was inadmissible for any reason. The record only reflects that before defense counsel began his redirect examination of Keith Knatt, defense counsel asked to approach the bench and that an off-the-record discussion was held.[14]
The State argues that Mr. Griffin failed to proffer Keith Knatt’s allegedly excluded testimony, “leaving no basis for appellate review.” In support, the State cites State v. Magee, 11-0574 (La.9/28/12), 103 So.3d 285. In that case, the Louisiana Supreme Court noted the following:
“The purpose of an offer of proof is to create a record of the excluded evidence so that the reviewing court will know what the evidence was and will thus be able to determine if the exclusion was improper, and if so, whether the improper exclusion' constituted reversible error.”
Magee, 11-0574 at pp. 62-63, 103 So.3d at 327-28 (quoting State v. Adams, 537 So.2d 1262, 1265 (La.App. 4th Cir.), aff'd in part, rev’d in part, 550 So.2d 595 (La.1989)). Expanding on the purpose of a proffer, the Supreme Court noted that the absence of a proffer renders a court “simply unable to opine, with any degree of certainty, whether [the proposed] ... testimony was improperly excluded. In short, this court cannot engage in speculation or conjecture as to the merits of an issue which was not properly preserved.” Magee, 11-0574 at p. 63, 103 So.3d at 328. As the State points out, Mr. Griffin failed to proffer Keith Knatt’s proposed testimony. He thus failed to properly preserve this issue.
Moreover, as noted above, the record is devoid of a ruling by the district court on, this issue for this court to consider. See State v. Clemons, 01-1032, p. 7 (La.App. 5 Cir. 2/26/02), 811 So.2d 1047, 1053 (finding *574 because “[t]he trial court did not rule on the objection” there was “no ruling for this panel to consider”). Given the record is devoid of any ruling by the district court on this issue coupled with Mr. Griffin’s failure to proffer Keith Knatt’s proposed testimony, we find the issue raised by Assignment of Error Number One is not properly before us. We thus decline to consider it.
Assignment of Error Number Two
In his second assignment of error, Mr. Griffin asserts that his trial counsel rendered ineffective assistance of counsel by failing to give a notice of an alibi defense, assuming such a notice was required. For the reasons outlined above in Assignment of Error Number One, the issue raised by Assignment of Error Number Two likewise is not properly before us. We thus decline to consider it.
Assignment of Error Number Three
In his third assignment of error, Mr. Griffin asserts that he was denied his right to present a defense when the district court made the following two rulings: (a) refused to permit Keith Knatt to testify that defendant was standing on the Knatts’ porch next to him at the time of the shooting; and (b) refused to permit Kim Knatt to testify that on the day after the shooting the victim told her he knew Mr. Griffin was not the person who shot him.
As discussed in Assignments of Error Numbers One and Two, the issue regarding the district court’s allegedly refusing to permit Keith Knatt to testify that, l^at the time of the shooting, Mr. Griffin was standing on the Knatts’ porch next to him is not properly before us. We thus decline to consider this aspect of Assignment of Error Number Three. The other part of this assignment of error relates to Kim Knatt’s excluded testimony.
On direct examination, Kim Knatt testified that she went to the hospital the day after the shooting to see Mr. Warner. She further testified that Mr. Warner made the following statement to her: “Ms. Kim, Dizzy didn’t shoot me, do you know who shot me — .” At this point, the State lodged a hearsay objection, which the district court sustained. Defense counsel later proffered the following testimony by Kim Knatt:
Q. You got to the hospital, what happened then?
A. He let me know it was his birthday and I told him happy birthday. And he said, “Ms. Kim, Dizzy,[sic] didn’t shoot me. You know who shot me?” and I said no.
Q. So he said to you, “Ms. Kim, Dizzy didn’t shoot me.”
A. Yes.
Q. “Do you know who shot me?”
A. Yes. That’s what he said and I said no.
Q. And you said no?
A. Yes.
At trial, defense counsel failed to raise a right-to-defense objection regarding the ruling excluding Kim Knatt’s proffered testimony.[15] It is well-settled that an irregularity or error, relating to “the ruling or order of the court,” cannot be availed of after verdict unless it was objected to at the time- of occurrence. La. C.Cr.P. art. 841 A; State v. Marlowe, 10-1116, p. 35 (La.App. 4 Cir. 12/22/11), 81 So.3d 944, 966. Not only must a contemporaneous objection be made, but also La. C.Cr.P. art. 841 A requires that a defen *575 dant make “known to the court ... the grounds therefor,” i.e., the grounds for his objection, and he is limited on appeal to the grounds articulated at trial. State v. Ott, 10-1307, p. 13 (La.App. 4 Cir. 1/5/12), 80 So.3d 1280, 1287. A new basis for objection cannot be raised for the first time on appeal. State v. Carter, 10-0614, pp. 27-28 (La.1/24/12), 84 So.3d 499, 521. Mr. Griffin thus is precluded from raising the issue on appeal that the district court’s ruling excluding the testimony of Kim Knatt violated his right to present a defense.
Despite Mr. Griffin’s failure to preserve this issue for appeal, we find it necessary to address this issue in light of his ineffective assistance of counsel argument set forth in Assignment of Error Number Four. Even assuming Mr. Griffin’s trial counsel had objected to the district court’s ruling or argued that the exclusion of Kim Knatt’s proffered testimony violated his right to present a defense, there was no reversible error in the district court’s ruling.
The Sixth and Fourteenth Amendments to the United States Constitution and Article 1, § 16 of the Louisiana Constitution guarantee a criminal defendant the meaningful opportunity to present a complete defense, including the right to compel the attendance of witnesses in his favor.[16] A defendant in a criminal case should be allowed to present “reliable” evidence on any relevant matter. State v. Casey, 99-0023, p. 18 (La.1/26/00), 775 So.2d 1022, 1037.[17] The Louisiana Supreme Court has recognized that under compelling circumstances, a defendant’s right to present a defense may require admission of statements that do not fall under any statutorily recognized exception to the hearsay rule. State v. Juniors, 03-2425, pp. 44-45 (La.6/29/05), 915 So.2d 291, 325-26 (citing State v. Van Winkle, 94-0947 (La.6/30/95), 658 So.2d 198); State v. Gremillion, 542 So.2d 1074 (La.1989). Generally, a trial court’s ruling as to the admissibility of evidence will not be disturbed absent a clear abuse of discretion. State v. Cyrus, 11-1175, p. 20 (La.App. 4 Cir. 7/5/12), 97 So.3d 554, 565 (citing State v. Richardson, 97-1995, p. 14 (La.App. 4 Cir. 3/3/99), 729 So.2d 114, 122).
Mr. Griffin does not present any argument that Kim Knatt’s proffered testimony was not inadmissible hearsay. Rather, he argues that even if the testimony was hearsay, Kim Knatt’s proffered testimony that someone else committed the offense was improperly excluded. In support, he cites, among other cases, Gremillion, supra.
*576 Kim Knatt’s proffered testimony was relevant to the issue of Mr. Griffin’s guilt of the crime charged.- Relevance, however, is only one factor in the analysis of whether inadmissible hearsay evidence may be-admitted pursuant to a defendant’s constitutional right to present a defense— to present witnesses in his favor. The jurisprudence has held that “normally inadmissible hearsay may be admitted if it is reliable, trustworthy and- relevant; and if to exclude it would ^compromise the defendant’s right to present a defénse.” Van Winkle, 94-0947 at p. 6, 658 So.2d at 202. The right to present a defense, however, does not require that the trial court permit the introduction of evidence that is irrelevant or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice. State v. Fernandez, 09-1727, p. 14 (La.App. 4 Cir. 10/6/10), 50 So.3d 219, 229.
The State contends that Kim Knatt’s proffered testimony was not reliable, trustworthy, or even plausible'. The State thus contends that it was not admissible pursuant to Mr. Griffin’s right to present a defense. The State cites the following factors in support of its contention:
• Kim Knatt was not impartial; she acknowledged knowing Mr. Griffin and his family for many years. ■
• Kim Knatt’s account of talking to Mr. Warner in the hospital lacks corroboration.
• It is. implausible that Mr. Warner would randomly blurt out that Mr. Griffin did not shoot him.'
• It is - implausible that. Mr. Warner would say that May 11th or 12th was his birthday (the State cites the police report in the case which lists Mr. Warner’s date of birth as June 2).
• It is. implausible that a man shot eight , times would be receiving visitors the following day.
• Detective Hurst testified that it was not until his fifth visit to the hospital that the victim was finally well enough to talk with him.
• Hospital records show that Mr. Warner underwent surgery on May 11 and May 12, and that he spent both ■ days breathing through a ventilator, heavily medicated, and under physical restraint.
Based on the above factors, the State contends that Kim Knatt’s account is highly suspect.
|2bAs noted above, the Louisiana Supreme Court in the Gremillion case recognized that a defendant’s “right to present a defense” under La. Const. art. I, § 16 “sometimes requires the admission : of hearsay evidence when there has been a strong showing of trustworthiness and necessity.” 542 So.2d at 1079 (Lemmon, J., assigning additional reasons). In a subsequent case, State v. Trahan, 576 So.2d 1 (La.1990), the Supreme Court noted that it had emphasized in the Gremillion case that the exception employed there was a very unusual exception to the rules of evidence and should be “sparingly applied.” Trahan, 576 So.2d at 11 (quoting Gremillion, 542 So.2d at 1079) (Lemmon, J., assigning additional reasons). The instant case is not one in which the very unusual exception .recognized in the Gremillion case applies. As the State contends, the record does not support a fihding that Kim Knatt’s proffered testimony was trustworthy or necessary.
First, Kim- Knatt was not established to be an impartial witness. Both Kim and Keith Knatt acknowledged knowing Mr. Griffin and his family for an extended period. Kim Knatt testified that she had been living in that neighborhood about forty-two *577 years; that she knew Mr. Griffin and his family from the neighborhood; and that she had known Mr. Griffin for approximately nineteen years. Keith Knatt testified that he lived with his mother and that he had lived in the same residence for twenty-six years. He acknowledged that he knew Mr. Griffin’s mother. He testified that he first met Mr. Griffin in school when they were in the sixth grade.
Second, although Mr.. Warner testified that Keith and Kim Knatt were his good friends, neither Kim nor Keith Knatt shared that view. Kim Knatt stated that she remembered Mr. Warner' as someone who used to fix her son’s (Keith Knatt’s) car. Likewise, Keith Knatt described his .relationship with Mr. Warner as not really |27a friendship. Rather, he stated that they worked on his car together, drank a little together, and hung out together sometimes.
Third, the circumstances under which the alleged statement was made to Kim Knatt do not show it was particularly reliable or trustworthy. Nothing in Kim Knatt’s proffered testimony or her other trial testimony suggests that Mr. Warner made the alleged statement in response to a question by her. Km Knatt’s proffered testimony suggests that Mr. Warner spontaneously volunteered that Mr. Griffin did not shoot him. There is no evidence indi-eating that Kim Knatt knew on the day after the shooting when she allegedly talked to Mr. Warner that Mr. Griffin had been accused of committing the crime. She testified that she had never talked to the police about the shooting and, in fact, had never talked with anyone about the shooting before giving'her testimony that day at trial.
Finally, Km -Knatt’s proffered testimony is not corroborated. To the contrary, as the State contends, the victim’s medical records support a finding that it is questionable whether he was capable of receiving visitors or engaging in meaningful conversation on the day after the- shooting.[18] Indeed, Detective Hurst testified that it was not until his fifth visit to the hospital, days.after the shooting, |Mwhen the victim came out of a coma that the victim was finally well enough to talk with him.
Under these- circumstances, Mr. Griffin has failed to establish that Kim Knatt’s proffered hearsay .testimony was reliable and trustworthy. Thus, the. district court did not violate Mr. Griffin’s -right to present a defense by excluding it. There is no merit to this assignment of error.
Assignment of Error Number Four
In this fourth assignment of error, Mr. Griffin asserts that his trial counsel ren *578 dered ineffective assistance of counsel by-failing to argue that the district court’s exclusion of Kim Knatt’s proffered testimony violated his right to present a defense. As previously concluded in Assignment of Error Number Three, Mr. Griffin’s right to present a defense was not violated by the district court’s exclusion of the evidence. Accordingly, Mr. Griffin’s trial counsel failure to raise the issue of Mr. Griffin’s right to present a defense as to the district court’s ruling sustaining the State’s hearsay objection to, and its exclusion of, Kim Knatt’s proffered testimony cannot constitute ineffective assistance of counsel. See State v. Brown, 12-0626, pp. 12-13 (La.App. 4 Cir. 4/10/13), 115 So.3d 564, 573-74 (setting forth the applicable jurisprudence on ineffective assistance of counsel). There is no merit to this assignment of error.
Assignment of Error Number Five
In his fifth, and final, assignment of error, Mr. Griffin asserts that the district court abused its discretion in denying his motion for mistrial under La. C.Cr.P. art. 771, after a police detective, Sergeant Pa-lumbo, when asked if he arrested Mr. Griffin for a traffic violation, responded that he arrested him also for being a felon in possession of a firearm.
lasAt trial, the following colloquy occurred between defense counsel and Sergeant Palumbo:
Q. You arrested Darryl?
A. Yes.
Q. For a traffic violation, right?
A. For a traffic violation, as well as being a felon in possession of a firearm.
At that point, defense counsel objected and asked to approach the bench. Sergeant Palumbo’s answer revealed that Mr. Griffin had been arrested on the night of May 11, 2008, for “being a felon in possession of a firearm.” His answer necessarily meant that Mr. Griffin had previously been convicted of a separate felony. Thereafter, a discussion took place off the record. A minute entry from that trial date reflects that Mr. Griffin orally moved for a mistrial and that the district court denied the motion.
Because the felon in possession of a firearm charge had been severed and because Mr. Griffin did not testify at trial, Mr. Griffin contends that the district court should have granted his motion for a mistrial pursuant to La. C.Cr.P. art. 771, as an admonishment would have been insufficient. Mr. Griffin argues that Sergeant Palumbo’s reference to his prior felony conviction made it impossible for him to receive a fair trial.
Motions for mistrial are governed by La. C.Cr.P. arts. 770, the mandatory mistrial provision, and La. Code Crim. Proc. art. 771, the discretionary mistrial provision. Mr. Griffin acknowledges that La. C.C.P. art. 770 is not applicable here. The reference to other crimes evidence was made by a police officer; it is well settled for purposes of art. 770 that a police officer is not a “court official.” State v. Augustine, 12-1759, pp. 7-8 (La.App. 4 Cir. 9/18/13), 125 So.3d 1203, 1208, writ denied, 13-2484 (La.4/4/14), 135 So.3d 639 (collecting cases).[19] Mr. Griffin’s argument thus is *579 based solely on La. C.Cr.P. art. 771.[20]
Evidence of other crimes or bad acts committed by the defendant is generally not admissible at trial. La. C.E. art. 404 B(1). In State v. Sartain, 98-0378 (La.App. 4 Cir. 12/1/99), 746 So.2d 837, this Court reviewed the relevant jurisprudence under La. C.Cr.P. art. 771, in general, as follows:
When a witness refers directly or indirectly to another crime committed or alleged to have been committed by the defendant, as to |atwhich evidence is not admissible, the defendant’s remedy is a request for an admonition or a mistrial pursuant to LSA-C.Cr.P. art. 771. The remark or comment must constitute an unambiguous reference to other crimes. On request, the trial court shall admonish the jury to disregard such remark or comment. La. C.Cr.P. art. 771. Upon motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant of a fair trial. The granting of a mistrial under La. C.Cr.P. art. 771 is at the discretion of the trial court and should be granted only where the prejudicial remarks of the witness make it impossible for the defendant to obtain a fair trial. Mistrial is a drastic remedy that is only authorized where substantial prejudice will otherwise result to the defendant. The determination of whether prejudice has resulted lies within the sound discretion of the trial court. A trial court’s ruling on whether or not to grant a mistrial because of comments by a police officer referring to other crimes evidence should not be disturbed absent a clear abuse of discretion.
Sartain, 98-0378 at pp. 10-11, 746 So.2d at 845-46 (internal citations omitted); see also State v. Ruffin, 11-0135, pp. 16-17 (La.App. 4 Cir. 12/21/11), 82 So.3d 497, 508-09 (quoting Sartain, supra).
This court in the Augustine case held that a mistrial is not warranted when a police officer makes a direct response to defense counsel’s questioning that refers to other crimes that the defendant committed. In that case, we rejected the defendant’s argument that the officer’s “reference to him being wanted on a murder charge mandated a mistrial pursuant to Louisiana Code of Criminal Procedure ar- *580 tides 770, 771 and Louisiana Code of Evidence article 404(B).” Augustine, 12-1759 at p. 7, 125 So.3d at 1208. In support, we cited State v. Kimble, 375 So.2d 924 (La.1979) and State v. Tribbet, 415 So.2d 182, 184 (La.1982). We noted that in Kimble, swpra, the Louisiana Supreme Court held that “‘the state cannot be charged with testimony ‘elicited by defense counsel implying that defendant had previously committed other crimes and that defendant cannot claim reversible error on the basis of that evidence which is elicited.’ ” Augustine, 12-1759 at p. 9, 125 So.3d at 1208. We further noted that the Supreme Court reiterated | S2its holding in the Tribbet case. Id. Finally, we noted that the prohibition of evidence of other bad acts in La. C.E. art. 404 B(1) does not apply to testimony elicited by defense counsel. Augustine, 12-1759 at p. 9, 125 So.3d at 1209.
Applying those principles here, -the statement of concern was<made by a police officer — Sergeant Palumbo — testifying in direct response to defense counsel’s questioning. It was thus testimony elicited by defense counsel. Sergeant Palumbo was responding to the defense counsel’s questioning as to what Mr. Griffin was arrested for when he referred to another crime committed by Mr. Griffin. Denying the motion for a mistrial, the district court orally reasoned that “the witness felt that he was being responsive to the question asked by Counsel. Therefore, in effect, opening the door with the response that was ultimately provided.” We agree. We thus find no abuse of discretion in the district court’s conclusion that the comment was not so prejudicial as to deprive defendant of a fair trial such as to warrant a mistrial under La. C.Cr.P. art. 771. There is no merit to this assignment of error.

DECREE

For the foregoing reasons, we affirm the defendant’s conviction and sentence.
AFFIRMED
DYSART, J., concurs in the result.

. As we routinely do, we have reviewed the record on appeal for errors patent and found one with respect to Mr. Griffin's sentence. This error, however, does not require any corrective action by this court. When resen-tencing defendant ás a third-felony habitual offender, the district court left out the restriction that the sentence be served without probation in addition to the restrictions that it be served without benefit of parole or suspension of sentence. See La. R.S. 15:529.1 G (providing that "[a]ny sentence imposed under the provision of this Section shall be at hard labor without benefit of probation or suspension of sentence”); see also State v. Sterling, 11-1837 (La.3/9/12), 84 So.3d 557 (providing that sentencing restrictions imposed on habitual offenders are those stipulated for the present felony as well as those in the applicable portions of the Habitual Offender Law, La. R.S. 15:529.1). The sentencing restrictions for Mr. Griffin’s present felony, his conviction for attempted second degree murder, are that the sentence,of not less than ten nor more than fifty years at hard labor be served without the benefit of parole, probation, or suspension of sentence. La. R.S. 14:27 D(1)(a). The district court thus erred in failing to stipulate in the sentence that it be served without the benefit probation. Pursuant to La. R.S. 15:301.1 A and State v. Williams, 00-1725, pp. 10-11 (La.11/28/01), 800 So.2d 790, 798-99, a sentence is deemed to have been imposed with .these restrictions of benefits even in the absence of the district court delineating them. State v. Fields, 12-0674, p. 4, n. 3 (La.App. 4 Cir. 6/19/13), 120 So.3d 309, 314, writ denied, 13-1692 (La.2/14/14), 132 So.3d 401, cert. denied, - U.S. -, 135 S.Ct. 121, 190 L.Ed.2d 92 (2014). Therefore, there is no need for this court to take any action to correct this part of the sentence.

. On January 21, 2014, the State nolle próse-quied the possession of a firearm by a felon charge.

. See State v. Felton, 13-1029, p. 2 (La.App. 4 Cir. 8/13/14) (unpub.), 2014 WL 3955004, writ denied, 14-1922 (La.6/1/15), 171 So.3d 266 (granting a motion to supplement and reasoning that "the materials will assist this Court in determining whether the trial court’s decision to exclude certain evidence relating to McCar-ter's prior threats denied Defendant’s right to present a' defense, an issue Defendant raises on appeal.")

, Kim Knatt testified regarding hearing the shots, seeing Mr. Warner on the ground at the scene, and visiting him in the hospital the next day,

. Mr. Warner admitted having the following three felony convictions: (i) in 2003, for obtaining property by false pretenses; (ii) in 2004, for communicating threats; and (iii) in 2007, in Louisiana, for criminal damage to *565 property. For his 2007 Louisiana felony conviction, he was placed on probation; he was still on probation at the time of the shooting. He presently lives out of state; after the .shooting, he did not feel safe living in New Orleans. He was still on probation when he moved from New Orleans after the shooting, but he was permitted to move.

. Mr. Warner described both Keith and Kim Knatt as his good friends.

. Mr. Warner testified that the one forty-ounce beer he shared with the three other *566 males was the only alcohol he consumed that entire day. Mr. Warner denied that when Mr. Griffin returned to the scene, he told Mr. Griffin that he was tired and drunk and just wanted to go home. However, defense counsel confronted Mr. Warner with a transcript of a prior hearing at which Mr. Warner purportedly said (relating what he said to Mr. Griffin): "I said I’m drunk.” He nevertheless maintained that he had not been drunk and that his testimony was that he had been "drinking.” A review of the transcript of the prior hearing reveals that at different points Mr. Warner testified to both-that he had been "drinking” and that he was "drunk.”

. Mr. Warner testified that he had many surgeries, and they had removed several bullets from his body. Mr. Warner testified that they gave him a new stomach; he had had a colostomy bag; he had a plate in his chest; and he was awaiting reconstructive surgery on one hip. He exhibited to the jury the scars from his injuries and surgical procedures.

. Sergeant Palumbo was the first officer to testify as to the make and model of the SUV involved in this case. He described it as a Chevrolet Trailblazer. At least one other officer referred to it as a ."Blazer.” For ease of discussion, the SUV will be referred to as the “Trailblazer.”

. At this point, the defense moved for a mistrial, which the district court denied.

. Sergeant Palumbo confirmed that the victim was still in the intensive care unit at the time the photographic identification proce *571 dure was conducted. The victim still had an IV. He recalled asking the nurse what the victim’s mental state was, and he said he was good. He did not ask if the victim was on morphine and did not ask if the victim was on any medication that could cloud his judgment.

. Detective Castelin testified that the. front windows of the Trailblazer were down.

. The discovery rules regarding an alibi defense are set forth in La. C.Cr.P. art. 727 A, which provides:
Upon written demand of the district attorney stating the time, .date, and place at which the alleged offense was committed, the defendant shall serve within ten days, or at such different time as the court may direct, upon the district attorney a written notice of his intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi.

. On April 24, 2015, Mr. Griffin filed a motion seeking to have, this court order the court reporter to "file into the record a transcript of all discussion and rulings on the issue of trial counsel’s failure to provide a notice of an alibi defense.” On April 28, 2015, this court issued an order to that effect, On May 26, 2015, the court reporter filed a certificate of unavailability of verbatim record, representing that she had been unable to find any record of such discussion and/or ruling. Mr. Griffin does not raise on appeal any issue with regard to the record being incomplete for appellate purposes or argue that defendant is prejudiced-by an incomplete record on appeal.

. As noted, the record is devoid of any ruling by the district court excluding Keith Knatt’s proposed testimony.

. See Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967) (holding that "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense.... Just as an accused has the right to confront the prosecution’s witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.”); Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973) (holding that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense.”); State v. Dressner, 08-1366, p. 15 (La.7/6/10), 45 So.3d 127, 137-38.

. All relevant evidence is admissible, and evidence that is not relevant is not admissible. La. C.E. art. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” La. C.E. art. 401. Evidence, although relevant, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.” La. C.E. art. 403.

. As noted at the outset-, the State introduced the medical records at trial for record purposes only. This Court granted the State’s Motion to Supplement the Appellate Record with portions of the medical records. The medical records reflect that Mr. Warner underwent emergency surgery on May 11, 2008, on the morning he was shot. Sergeant Palumbo testified that he spoke to Mr. Warner on May 11, 2008, as he was being moved into surgery. The victim underwent further surgery the following day, May 12, 2008. An order dated May 11, 2008, reflected that Mr. Warner was placed in wrist restraints from 7:00 p.m. that day to 7:00 p.m. on May 12, 2008, after he attempted to pull out his IV lines; the order contains a notation that he was "extremely disoriented, confused and agitated.” The order was renewed on May 12, 2008, from 7:00 p.m. that day until 7:00 p.m. on May 13, 2008, with the notation: "Anesthesia/ICU (potential for injuries neurological impairment).” A "Physician Surgical Critical Care Progress Note” dated May 11, 2008, noted that Mr. Warner was sedated with Fentanyl and Propofol. A "Physician Surgical Critical Care Progress Note’-’ dated May 12, 2008, noted that Mr. Warner was sedated with Lorazepam and had been administered the analgesic Fentanyl, although he was noted as responding to commands.

. In State v. Augustine, 12-1759, p. 8 (La.App. 4 Cir. 9/18/13), 125 So.3d 1203, 1208, writ denied, 2013-2484 (La.4/4/14), 135 So.3d 639, we also noted the following:
[T]he Louisiana Supreme Court, in State v. Schwartz, 354 So.2d 1332 (La.1978), questioned the wisdom of “our recent statements that a police officer witness is not a ‘court official' whose reference to inadmissible other crimes evidence mandates a mistrial under La. C.Cr.P. art 770.” The Court in that case noted that a police officer’s gratuitous implication of the defendant in other crimes and the officer’s recur *579 ring pattern of unresponsive answers in a number of cases would not be excused as inadvertent, unplanned or unexpected by a prosecutor. Id. at 1333, n. 2."
Id. In this case, none of those circumstances are present. The well-settled rule that a police officer is not a "court official” under La. C.Cr.P. art. 770 thus applies here.

. La. C.Cr.P. art. 771 provides as follows:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
il) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
See also La. C.Cr.P. art. 775 (providing that, "upon motion by a defendant, a mistrial shall be ordered ... when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.”).