STATE OF LOUISIANA * NO. 2023-KA-0594

VERSUS *

COURT OF APPEAL

EDWARD R. BUDD *

FOURTH CIRCUIT

*

STATE OF LOUISIANA

* * * * * * *


APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 553-085, SECTION "A"
Honorable Simone A. Levine[1]
* * * * * *
**Judge Dale N. Atkins**
* * * * * *
(Court composed of Chief Judge Terri F. Love, Judge Roland L. Belsome, Judge Dale N. Atkins)


Edward R. Budd #776604
Dixon Correctional Center
P. O. Box 788
Jackson, LA 70748

      APPELLANT


Mary Constance Hanes
LOUISIANA APPELLATE PROJECT
1538 Short Street
New Orleans, LA 70118

      COUNSEL FOR APPELLANT, Edward R. Budd

Jason R. Williams, District Attorney
Brad Scott, Chief of Appeals
Zachary M. Phillips, Assistant District Attorney
ORLEANS PARISH DISTRICT ATTORNEY'S OFFICE
619 S. White Street
New Orleans, LA 70119

      COUNSEL FOR APPELLEE, State of Louisiana

---

[1] We note that the presiding and sentencing judge was the Honorable Laurie A. White.

**SENTENCE VACATED; REMANDED FOR
RESENTENCING
JULY 26, 2024**

This is a criminal matter. Appellant, Edward R. Budd ("Mr. Budd"), appeals the sentence he received for his conviction of sexual battery, a violation of La R.S. 14:43.1(A)(1). On appeal, Mr. Budd argues that his sentence is unconstitutionally excessive. Mr. Budd's appeal also asks this court to resolve the discrepancy between the trial transcript, in which the district court judge announced the verdict as guilty of sexual battery, and the minute entry, which reflects that he was convicted of third-degree rape. For the reasons that follow, we vacate Mr. Budd's sentence, and we remand for resentencing in accordance with La. R.S. 14:43.1(C)(1). We further remand for the purpose of correcting the minute and docket master entries, as well as the sentencing commitment order, to reflect that Mr. Budd was convicted of sexual battery, a violation of La. R.S. 14:43.1(A)(1). In all other respects, Mr. Budd's conviction is affirmed.

## STATEMENT OF THE CASE

On January 10, 2022, the State of Louisiana ("State") charged Mr. Budd, by bill of information in Case Number 553-085 with the May 14, 2021 third-degree rape of C.K.,[2] a felony in violation of La. R.S. 14:43 ("C.K. Case"). At that time, a

---

[2] Because of the nature of the crimes alleged herein, this Opinion will refer to all of the alleged sex offense victims by their initials to protect their identities.

1

charge of first-degree rape of a different victim, H.W., a violation of La. R.S. 1442, was pending against Mr. Budd and his co-defendant Echo Hurlburt ("Mr. Hurlburt") in a different case, Case Number 547-278, in section "A" of Orleans Parish Criminal District Court ("H.W. Case"). Because of the pending H.W. Case, the district court transferred the C.K. Case to Section "A." On March 7, 2022, Mr. Budd entered a plea of not guilty in the C.K. Case.

On April 1, 2022, in the C.K. Case, the State filed a "Notice to Introduce Evidence of . . . Sexually Assaultive Behavior Pursuant to La. C.E. art. 412.2" ("First Notice").[3] In this First Notice, the State sought to introduce evidence of Mr. Budd's alleged aggravated rape of H.W. in 2019. The district court "granted" the State's First Notice and announced that the C.K. Case and the H.W. Case would be tried together.

On May 16, 2022, defense counsel filed a waiver of the constitutional right to a jury trial. The State filed an opposition arguing that the waiver was untimely; but the State subsequently withdrew its opposition on May 26, 2022. Then, on May 28, 2022, Mr. Budd waived his right to a trial by jury and signed a written waiver of rights, after which the district court granted a judge trial.

See La. R.S. 46:1844(W)(1)(a) (providing that "[i]n order to protect the identity and provide for the safety and welfare of . . . victims of sex offenses . . . all public officials and officers and public agencies, including but not limited to . . . judicial officers, . . . shall not publicly disclose the name, address, contact information, or identity of . . . victims of sex offenses . . . ."). *See also State v. McDonough*, 2022-0628, p. 1 (La. App. 4 Cir. 10/27/23), 376 So.3d 1003, 1009 n.1 (quoting La. R.S. 46:1844(W)(1)(a)).

[3] Louisiana Code of Evidence Article 412.2 is titled "Evidence of similar crimes, wrongs, or acts in sex offense cases." It states that "[w]hen an accused is charged with a crime involving sexually assaultive behavior," then "evidence of the accused's commission of another crime, wrong, or act involving sexually assaultive behavior . . . may be admissible and may be considered for its bearing on any matter to which it is relevant subject to" a balancing test provided in La. C.E. art. 403.

Thereafter, on September 29, 2022, the State filed another "Notice of Intent to Introduce Evidence of Sexually Assaultive Behavior Pursuant to La. C.E. art. 412.2" ("Second Notice"). Therein, the State sought to introduce evidence of three prior sexual offenses allegedly committed by Mr. Budd against L.W., A.M., and a fellow student when he was in high school. The district court held a hearing on the State's Second Notice on October 5, 2022, and denied the State's Second Notice. The State filed a writ application with this Court concerning the district court's denial of its Second Notice, but this Court denied the State's writ application.[4] The State did not seek review with the Louisiana Supreme Court.

On October 11, 2022, the State amended its Second Notice so that it contained only the alleged prior sexual offense committed by Mr. Budd against L.W. ("Amended Second Notice").[5] In response, Mr. Budd's defense counsel informed the district court that the State showed him the Amended Second Notice, which had more specific details thereby enabling the defense to investigate for trial preparation. Further, defense counsel stated that the Amended Second Notice complied with the requirements of La. C.E. art. 412.2. Without any objection from defense counsel, the district court "granted" the State's Amended Second Notice.

On November 2, 2022, the case proceeded to a bench trial. The district court found Mr. Budd not guilty of the first-degree rape of H.W. As to C.K., the district court found Mr. Budd guilty of a lesser charge, sexual battery. However, the

---

[4] *State of Louisiana v. Edward Budd*, 2022-K-0661 (La. App. 4 Cir. 10/7/22).

[5] That is, the State no longer sought to introduce evidence of the prior sexual offenses allegedly committed by Mr. Budd against A.M. and a fellow student when he was in high school.

docket master and minute entry indicate the district court found Mr. Budd guilty of third-degree rape of C.K.

Mr. Budd appeared for sentencing on December 1, 2022, and on the same day filed a motion for new trial, which the district court denied. Mr. Budd waived all delays, and the district court sentenced him to ten years' imprisonment at hard labor with two years suspended and to be served concurrently with any other sentences. The district court also sentenced Mr. Budd to five years of active probation following his release and ordered that he participate in psychiatric counseling. Finally, the district court ordered Mr. Budd to register as a sex offender for fifteen years.

On December 7, 2022, Mr. Budd filed a motion to reconsider sentence, which the district court denied. Mr. Budd filed a motion for appeal on January 21, 2023, which the district court granted on the same day. His timely appeal to this Court followed.

## STATEMENT OF FACTS

### Trial

As previously noted, the State charged Mr. Budd by bill of information with the third-degree rape of C.K. and the first-degree rape of H.W. Mr. Budd waived his right to a jury trial, and on November 2, 2022, the case proceeded to a three-day bench trial.[6]

---

[6] Because the H.W. Case is not at issue in this appeal, the majority of the facts and testimony involving the charge related to H.W. will not be recounted herein, except for information as it relates to the admission of evidence for other sexually assaultive behavior per the State's First Notice.

4

*Heidi Martin's Testimony*

The State commenced the trial by presenting the testimony of its expert witness, Heidi Martin ("Ms. Martin"). Ms. Martin testified that she was a Sexual Assault Nurse Examiner ("SANE") Coordinator at University Medical Center where she oversaw the training of nurses. Ms. Martin also testified that she is a registered nurse and has a Bachelor of Science degree in nursing. Additionally, Ms. Martin reported that she started training as a forensic nurse in 2017 and is SANE certified for the International Association of Forensic Nurses ("IAFN"). The State offered her curriculum vitae and the district court admitted her as an expert in sexual assault, sexual assault forensic examination, and trauma.

Ms. Martin testified that, based on her experience, not all victims of sexual assault report their assault to the police immediately due to fear and shame, such that some victims engage in delayed reporting. When asked whether she would expect to find physical injuries even in those victims who do report their assault and go to the hospital to receive a sexual assault exam, Ms. Martin responded that in most cases of sexual assault there are no physical injuries. Rather, according to Ms. Martin, "[v]aginal soreness and tenderness tends to be a very common finding" because a lack of "proper lubrication . . . causes abrasion or micro tears to the area and can be painful." In addition to vaginal soreness, Ms. Martin testified that sexual assault victims often experience pain during urination from the abrasions and tears, as well as swelling, which usually lasts a few days.

Additionally, Ms. Martin testified that sexual assault victims exhibit emotional symptoms in a variety of ways, including being visibly distraught or having a flat affect and exhibiting "little expression of emotion." Ms. Martin also offered testimony concerning a phenomenon known as "tonic immobility" which

refers to victims freezing in traumatic situations as a survival mechanism, rather than engaging in a "fight or flight" response. She also described that people have fragmented or non-linear memories because the brain does not code memories normally when someone has gone through a traumatic experience like sexual assault. Further, Ms. Martin stated that "[m]ore often than not [a woman is sexually assaulted by] someone that she knows, a friend, or an acquaintance."

***L.W.'s Testimony***

L.W., the State's second witness, testified pursuant to La. C.E. art. 412.2. and began her testimony by explaining that she was the cousin of Mr. Budd's wife, Rebecca Gustafson ("Ms. Gustafson"), whom she referred to as "Becky."[7] According to L.W., Becky was three years older than she, and they were very close. She stated that Becky married Mr. Budd in March 2011.

L.W. explained that in July 2011, she visited Becky and Mr. Budd for an overnight stay at their home. On the evening of her stay, according to L.W., she and Becky were drinking wine, which Mr. Budd served to them after pouring the drinks from a bottle located in the kitchen. L.W. stated that after Becky drank a second glass of wine, Becky suddenly fell asleep on the couch. L.W. testified that she had been out drinking with Becky many times and had never witnessed Becky "just fall out like that." However, L.W. noted that before Mr. Budd carried Becky to the bedroom, he told her that it was normal for Becky.

L.W. further testified she believed that the night was over at that point until Mr. Budd offered her another glass of wine while they watched a documentary. Thereafter, according to L.W., she finished the wine and suddenly "felt funny" and

_____

[7] This Opinion will refer to Ms. Gustafson as "Becky" in the summary of L.W.'s testimony.

6

"pretty . . . woozy all of a sudden," at which point she stood up while Mr. Budd came close to her and whispered in her ear how much he liked the song that was playing. L.W. stated that she subsequently sat down and her memory started fading in and out in flashes.

L.W. then recalled that her next memory was laying on the sofa pushing Mr. Budd off of her, but then the next moment she remembered was being upstairs in the guest bedroom. She further recalled that the first sensation she registered in the bedroom was "a heavy weight on top of [her]," at which point she realized that her shorts were off and that Mr. Budd was penetrating her. L.W. testified that her "brain was saying like to get out of this situation, but her body could [not] do what her brain was telling her to do." She stated that she was physically incapable of removing herself from the situation but said "no" and tried to roll out from underneath Mr. Budd, though she was unsuccessful in getting away from him. L.W. also stated that she kept thinking about Becky and not wanting to hurt her, and L.W. testified that she said "Becky," to which Mr. Budd responded by telling her that Becky was not going to wake up. L.W. further testified Mr. Budd became increasingly rough and, ultimately, the bed broke. According to L.W., after the bed broke, her next vivid memory was of being on the floor, nauseated and vomiting, with Mr. Budd penetrating her anally.

L.W. testified that when she woke up the next morning, she found semen on herself and discovered that she was bleeding vaginally and rectally. L.W. explained that she showered because she had to go to work; but L.W. recalled experiencing a stinging, painful sensation during her shower. Then L.W. testified that when she began to dress for work, she noticed bruises on her thighs and neck and realized her genitals were swollen and painful.

7

L.W. further testified that she did not report her sexual assault to anyone until September 2011 when she told her friend Lindsay and eventually told Becky after a therapist encouraged her to do so. Additionally, L.W. testified that she told Becky that Mr. Budd had put something in her drink because they had not consumed a lot of alcohol and she "had never felt that way after drinking."

***Ms. Gustafson's Testimony***

Ms. Gustafson, Mr. Budd's ex-wife, testified that she was married to Mr. Budd from 2011 to 2013. She recalled the night in July 2011 that her cousin, L.W., came over to stay. That night, according to Ms. Gustafson, she, L.W., and Mr. Budd were all drinking wine, which Mr. Budd poured in the kitchen and brought to her and L.W. in the den. She said she recalled going to sleep before everyone but that she did not remember because "like [she] just went out." Per Ms. Gustafson, when she started to change the sheets on the guest bed the next morning, she noticed that the front leg of the bed was newly broken. Ms. Gustafson also stated that L.W. took a shower that morning, which she found "weird" because she and L.W. grew up together and she knew L.W. always took a bath at night before bed. Ms. Gustafson stated that she mentioned this to Mr. Budd, but he did not have a response. Ms. Gustafson testified that in August 2019, she visited L.W., whereupon L.W. told her what had happened in July 2011 and was "[v]ery sad, crying, very just disturbed and bothered." On cross-examination, Ms. Gustafson testified that L.W. never returned to the house after July 2011.

***Lindsay Stoltz's Testimony***

Lindsay Stoltz ("Ms. Stoltz") testified that she has been best friends with L.W. since third grade. According to Ms. Stoltz, on September 10, 2011, she and

L.W. were sitting outside a café in New Orleans when L.W. told her she had been raped by Mr. Budd and that Mr. Budd was still trying to contact her.

During trial, while Ms. Stoltz was testifying, Mr. Budd's counsel objected to her testimony on the basis of relevance and hearsay, whereupon the following colloquy occurred:

> [COUNSEL FOR MR. BUDD]:
> Your Honor, [I am] going to object to the relevance and the hearsay.
>
> [COUNSEL FOR THE STATE]:
> Your Honor, the State does have a burden. While it is not beyond a reasonable doubt –
>
> THE COURT:
> For a 412?
>
> [COUNSEL FOR THE] STATE:
> Yes, we do have to put on evidence of what happened. We put on the victim, and we have here the first person that she told.
>
> THE COURT:
> And how is hearsay of a 412 victim admissible when the 412 issue is not the trial?
>
> [COUNSEL FOR THE STATE]:
> Because I believe we still have a burden to show –
>
> THE COURT:
> I [do not] think this is admissible on this because . . . I think [it is] hearsay.
>
> [COUNSEL FOR MR. BUDD]:
>
> [A]llowing . . . the testimony of a victim of another crime is an exception, and I would argue that it does [not] extend to everything that goes into hearsay exceptions as it pertains to those additional uncharged crimes.
>
> . . . .
>
> [COUNSEL FOR MR. BUDD]:
>
> I think, your Honor, this is the only 412 first reporter.

. . . .

THE COURT:
No. [I have] already heard the testimony from a gentleman about a week ago that was [not] first report.

[COUNSEL FOR THE STATE]:
[That is] a different count.

. . . .

THE COURT:
But I realize that we have multiple counts here so I know what your case is going to be. Give me some case law on this. Finish with this witness, but I [am] not going to hear hearsay over and over.

Ms. Stoltz continued her testimony, and defense counsel did not move for a mistrial at this time.

***Sergeant Patrick Kennelly***

The first day of trial ended with the testimony of Sergeant Patrick Kennelly ("Sgt. Kennelly"). Sgt. Kennelly testified that he presently served as the supervising sergeant for the New Orleans Police Department ("NOPD") Sex Crimes Unit. Sgt. Kennelly reported that his investigation of Mr. Budd began after the Sex Crimes Unit received a call from the Sexual Trauma Advocate and Response ("STAR") advocate, who needed assistance taking a statement from a sexual assault victim, C.K. According to Sgt. Kennelly, C.K.'s alleged assault had occurred approximately two weeks prior, so the Sex Crimes Unit took C.K. to the hospital where she was interviewed. During Sgt. Kennelly's testimony, the State showed a video, which Sgt. Kennelly identified as C.K.'s statement, and the State offered and introduced it into evidence. Sgt. Kennelly testified that during C.K.'s

interview, at which he was present, C.K. was able to describe her assault and provide the name of the assailant, "Eddie Ortego."[8]

Sgt. Kennelly testified that the Sex Crimes Unit was ultimately able to determine that "Eddie Ortego" and "Edward Budd" were the same person. To this end, Sgt. Kennelly explained that he and Detective Laborde used police software to review height, weight, and basic descriptive information, which yielded a result based on C.K.'s description. He further explained that Detective Danielle Williams conducted a photographic lineup with C.K., who made a positive identification of Mr. Budd. The State offered and introduced the photographic lineup into evidence. Sgt. Kennelly stated that after a positive identification by C.K., a former NOPD detective drafted and authored an arrest warrant for Mr. Budd's arrest. During Sgt. Kennelly's testimony, the State also offered and introduced the arrest warrant into evidence.

On cross examination of Sgt. Kennelly, Mr. Budd's counsel asked if the Sex Crimes Unit tested C.K. for drugs; but Sgt. Kennelly testified that C.K. did not allege that she had been drugged during the assault, so the NOPD "did not have any reason to" test her for drugs. Sgt. Kennelly acknowledged that his involvement was limited to taking C.K.'s statement, reviewing and presenting the arrest warrant to the magistrate judge, and reviewing Detective Brandon McDonald's supplemental report.

---

[8] The spelling "Ortega" also appears in the record.

***Detective Brandon McDonald[9]***

On the second day of trial, the State called as its first witness, Detective Brandon McDonald ("Det. McDonald") of the NOPD Sex Crimes Unit. Det. McDonald testified that he was assigned as lead detective in C.K.'s third-degree rape case after the original detective assigned to the case resigned from the NOPD. Det. McDonald testified about his investigation and arrest of Mr. Budd; and he stated that by the time he was assigned to the case, an arrest warrant had already been issued for Mr. Budd.

Det. McDonald testified that he spoke to C.K., and she reported that she was with other crew members where they were filming on location in Marrero. Det. McDonald explained that C.K. told him that she and some other crew members, including Mr. Budd, went to a local bar in Algiers, where they had several drinks. He testified that C.K. reported that from there they went to another bar in Metairie, where they continued to drink. Det. McDonald indicated that C.K. stated that she realized she was too intoxicated to drive and she let Mr. Budd drive her vehicle back to his residence because they were all going back to his house to work on the video. Det. McDonald further explained that C.K. reported that while she was at Mr. Budd's house she realized she was very intoxicated, so her friend, "Cassie,"[10] told her it was okay to rest in the bedroom until she felt like driving back to Baton Rouge. Det. McDonald also testified that C.K. stated that Cassie followed her to the bedroom, and made sure she was asleep. He stated that C.K. said she went to sleep fully clothed and at some point everyone else went into the kitchen and then

---

[9] Det. McDonald also testified regarding his investigation of the sexual assault of H.W., which will not be recounted here.

[10] The nickname "Cassie" refers to Cassandra Rumping.

left. C.K. reported to Det. McDonald that she woke up to Mr. Budd engaging in sexual intercourse with her, but then would black out and subsequently wake up again in a different position. Det. McDonald testified that C.K. reported that at some point she told Mr. Budd that she needed to go to her vehicle, and he stopped and took her back to her vehicle. Det. McDonald stated he obtained statements from C.K.'s two coworkers, Cassandra "Cassie" Rumping ("Ms. Rumping") and Jeremy Spring ("Mr. Spring"). Det. McDonald stated that he also obtained a statement from C.K.'s father.[11] He further testified that he obtained a statement from John Bradley Rushing ("Mr. Rushing"), C.K.'s mentor, who provided Det. McDonald with text message conversations between himself and C.K. when she reached out to him for advice and told him what happened.

Det. McDonald testified that he noted similarities between H.W.'s and C.K's assaults, such as both were very intoxicated, blacking out, and the feeling where they could not move and could not remember how everything happened.

### Cassandra Rumping's Testimony

Next, the State presented the testimony of Cassandra Rumping ("Ms. Rumping"). Ms. Rumping testified that she was a freelance producer who was hired to produce a music video. Ms. Rumping acknowledged that she hired Mr. Budd, who used the name Eddie Ortega, on a photoshoot as the first assistant director. She testified that when she hired Mr. Budd, he failed to disclose that there was a pending sexual assault charge against him. She further acknowledged that had he disclosed that information, she would not have hired him. Additionally, Ms. Rumping stated that she hired C.K. as the "second assistant camera." She described

---

[11] We will not identify C.K.'s father by name in order to preserve C.K.'s anonymity.

C.K. as "very quiet, reserved, super well-mannered, sweet, just to herself, very nice person."

Ms. Rumping testified that prior to the incident alleged by C.K., she, C.K., and "Eddie Ortega" were part of a team that filmed a music video from 8:00 a.m. to 10:30 p.m. Thereafter, according to Ms. Rumping, she went to Crown & Anchor with Mr. Budd, C.K., and Mr. Spring where they consumed several drinks. After about an hour, as Ms. Rumping explained, the four left and went to the Swamp Room, a bar in Metairie, where they stayed until it closed at 2:00 a.m. on May 14, 2021. Ms. Rumping testified that Mr. Budd then suggested that they all go to his house, where the group consumed more drinks. There, according to Ms. Rumping, C.K. realized she was too tired to safely drive home to Baton Rouge.

Ms. Rumping further testified that, at some point, C.K. asked Mr. Budd if she could take a nap, and he suggested that she lay down in his room. Ms. Rumping stated that she accompanied C.K. to Mr. Budd's bedroom, helped her get into bed and C.K. was fully clothed at that time. Ms. Rumping left Mr. Budd's house around 6:00 a.m., and Mr. Spring had already left by that time.

Ms. Rumping testified that C.K. called her a couple of days after and told her that Mr. Budd had raped her and that she felt that there was nothing she could have done to stop the rape. As Ms. Rumping recalled the conversation, C.K. told her that she "wished she would have told [her] what had happened sooner," but she had been processing "what went on." Ms. Rumping further recalled that C.K. told her that while she was asleep, Mr. Budd entered the room and, as she was "coming to," she realized her clothes were being taken off. Ms. Rumping stated that C.K. told her that she "realized that this was happening non-consensually," but that she "sort of like froze in shock and fear and sort of like confusion." Additionally, as

14

Ms. Rumping recalled, C.K. told Ms. Rumping that Mr. Budd then proceeded to "rape" her, and "she felt like there was nothing that she could do to stop it." Ms. Rumping testified that C.K. asked if she had been suggestive or flirtatious with the defendant, and Ms. Rumping answered, "Absolutely not." She testified that C.K. was "super professional," and that it was "really clear" that C.K. had gone out with the group because she "wanted to be surrounded by people that were working in the industry."

On cross-examination, Ms. Rumping testified that after C.K. told her that she was raped by Mr. Budd, he texted her, "about something that [was not] a work-related thing." Ms. Rumping testified that she did not want Mr. Budd to know that she "knew what happened," so she gave a "polite but not engaging" response.

### C.K.'s Testimony

C.K. testified that on the morning of May 13, 2021, she drove from Baton Rouge to Marrero to work on the photo shoot for a music video. She explained that she arrived before the 8:00 a.m. call time and the crew finished around sundown. C.K. testified that after filming was completed, the crew went for a drink at the Crown & Anchor Pub in New Orleans. After approximately one hour, according to C.K., she drove to another bar, the Swamp Room, to meet up with a few members of the group, including Mr. Budd (known to C.K. as "Eddie Ortega"), Ms. Rumping, and Mr. Spring. C.K. stated that while at the Swamp Room, she had two drinks and ate some appetizers.

C.K. testified that at the Swamp Room, [Mr. Budd], "was mostly paying attention to [her], but [she] was trying to be a part of . . . everybody's conversation." C.K. stated the group stayed at the Swamp Room until closing and then proceeded to Mr. Budd's house "to finish some post-production work." She

15

did not think she should be driving so she left her car at the bar and rode with Mr. Budd. C.K. testified that at Mr. Budd's house, the group worked on "post-production" and drank. She further testified that she consumed "maybe a shot or two of something." C.K. testified that around sunrise, or 6:00 a.m., she felt very tired and asked Mr. Budd if there was somewhere she could lay down and sleep for a while, to which Mr. Budd responded she would be most comfortable in his bedroom. C.K. further testified Ms. Rumping helped her into bed where she quickly fell asleep fully clothed.

C.K. testified the next thing she remembered was that she woke up without any clothes on her body. She explained, "I was being pulled on top of [Mr. Budd], and I just, I [could not] move, and I wanted to yell and I [could not] yell . . . He was having sex with me, but I [did not] want that." She explained that Mr. Budd was also naked and reemphasized that she "just [could not] move." C.K. testified that Mr. Budd "raped" her twice, explaining "I wanted to yell, but it was just like my throat closed up, and I just [could not] feel anything." C.K. stated that she drifted in and out of consciousness and woke up around 3:00 p.m. because her phone was ringing. She described that Mr. Budd "came up behind [her] and started having sex with [her] again for the third time. [She] did [not] want it." C.K. testified that Mr. Budd asked her if she was on birth control to which she replied yes. She stated that at some point Mr. Budd "simply stopped," and she told him she needed to go home. Thereafter, according to C.K., they got dressed, Mr. Budd drove her back to her car, and C.K. had no contact with him since the morning of May 14, 2021.

C.K. further testified that she never consented to having sex with Mr. Budd. C.K. stated that she delayed in reporting the rape to the police because she did not

16

"fully understand what exactly happened." In this regard, she explained that she was unsure initially if she had sent mixed signals to Mr. Budd. C.K. stated that ultimately she determined that she was raped because she did not consent to having sex with Mr. Budd. She testified that about one week after the rape, she reported it to the police and told the detective that "Eddie Ortega" raped her. C.K. identified Mr. Budd through a photographic lineup.

At the conclusion of the trial on November 4, 2022, the district court found Mr. Budd guilty of a lesser verdict, sexual battery, in the C.W. Case according to the transcript of the proceedings. The district court set sentencing for December 1, 2022.

### Sentencing and Motion for New Trial

On November 14, 2022, Mr. Budd filed a motion for a new trial. Mr. Budd appeared for his sentencing hearing on December 1, 2022. During the sentencing hearing, the district court also addressed Mr. Budd's motion for new trial, which the district court denied. At that time, defense counsel waived sentencing delays and requested that the sentencing hearing be held immediately. Prior to sentencing, the district court reminded the parties that Mr. Budd was found guilty of sexual battery, under La. R.S. 14:43.1. The district court then imposed the following sentence upon Mr. Budd: ten years at hard labor with the Department of Corrections, two years suspended, and five years of active probation, with the sentence to run concurrently with any and all other counts. The district court also ordered Mr. Budd to participate in psychiatric counseling for the five years of probation, and to register as a sex offender for a term of fifteen years. The district court determined that Mr. Budd acted without the consent of the victim.

After sentencing, on December 7, 2022, Mr. Budd filed a motion to reconsider sentence pursuant to La. C.Cr.P. art. 881.1, which the district court denied. Defense counsel filed a notice of appeal on January 31, 2023, which the district court granted.

## ASSIGNMENTS OF ERROR

Mr. Budd assigns two counseled errors on appeal:

1. There is a discrepancy between the minute entry for the verdict (which shows that [Mr. Budd] was found guilty of the third degree rape) and the transcript where the trial judge announced the verdict (which shows Mr. Budd was found guilty of the lesser offense of sexual battery); and

2. Mr. Budd's ten-year sentence for sexual battery is excessive under the circumstances.

Mr. Budd also assigns two *pro se* errors on appeal:

1. [Mr. Budd] was not present for a critical stage of the proceeding and did not waive his appearance concerning inadmissible evidence; and

2. A mistrial should have been granted due to prosecutorial misconduct by introducing inadmissible evidence.

## ERRORS PATENT REVIEW

Before we address the assignments of error, we must conduct a review of Mr. Budd's appeal for errors patent. In accordance with La. C.Cr.P. art. 920, this court reviews all appeals for errors patent. *State v. McDonough*, 2022-0628, p. 19 (La. App. 4 Cir. 10/27/23), 376 So.3d 1003, 1018. "An error patent is one 'that is discoverable by a mere inspection of the pleadings and proceedings without inspection of the evidence.'" *Id.* (quoting La. C.Cr.P. art 920(2)). Our review of the record has revealed two errors patent.

***Error Patent Number One / Counseled Assignment of Error Number One***

First, there is a discrepancy between the minute entry and the transcripts, with the minute entry listing a conviction of third-degree rape, while the transcripts indicate a conviction of sexual battery. This error patent is also raised in counseled assignment of error number one, wherein counsel for Mr. Budd contends there is a discrepancy between the November 4, 2022 minute entry, which reflects that he was convicted of third degree rape, and the trial transcript for the same date, which reflects that the judge announced the verdict as guilty of sexual battery. In counseled assignment of error number one, counsel for Mr. Budd also notes that the sentencing commitment order reflects that he was convicted of third-degree rape. Further, the State concedes in its brief to this Court that Mr. Budd was convicted of sexual battery and that the minute entries and docket master reflect the wrong conviction and should be corrected.

As this Court has previously held, when "there is a discrepancy between a minute entry and the transcript, the transcript prevails." *State v. Lawrence*, 2012-1026, p. 5 (La. App. 4 Cir. 7/3/13), 120 So.3d 812, 816 (citing *State v. Randall*, 2010-1027, p. 3 (La. App. 4 Cir. 6/22/11), 69 So.3d 683, 685). In his counseled brief to this Court, Mr. Budd cites to this Court's opinion in *State v. Bailey.* In *Bailey*, the defendant asserted there was "a discrepancy between the sentencing transcript and the minute entry as to the amount of the fine imposed." 2012-1662, p. 6 (La. App. 4 Cir. 10/23/13), 126 So.3d 702, 706. This Court agreed with the defendant that there was a discrepancy; and, accordingly, this Court ordered the district court "to amend the pertinent minute entry to reflect the fine imposed by the sentencing transcript and instruct the Clerk of Court to transmit the corrected document to the officer in charge of the institution to which defendant has been

19

sentenced." *Id.* (first citing La. C.Cr.P. art. 892(B)(2); and then citing *State ex rel. Roland v. State*, 2006-0244 (La. 9/15/06), 937 So.2d 846).

A review of the record supports Mr. Budd's contention: Mr. Budd is correct that the minute entry from November 4, 2022 reflects that he was convicted of third-degree rape, but the November 4, 2022 transcript reveals that the district court found Mr. Budd guilty of sexual battery, a lesser charge than third-degree rape. Additionally, the minute entry from the December 1, 2022 sentencing hearing also reflects a conviction of third-degree rape under La. R.S. 14:43. However, as previously explained, during the sentencing hearing on December 1, 2022, the district court reiterated that Mr. Budd was convicted of sexual battery as evidenced by the transcript. These discrepancies constitute an error patent. Because a discrepancy between the transcript and minute entry must be resolved in favor of the transcript, the November 4, 2022 and December 1, 2022 transcripts, in which the district court found Mr. Budd guilty of the lesser charge, sexual battery, prevail over the minute entries for those two dates. Accordingly, we remand this matter to the district court and order the district court to amend the minute entries for November 4, 2022, and December 1, 2022, to conform to the transcripts for the same dates. Further, we order the district court to instruct the Clerk of Criminal District Court to transmit the corrected documents to the officer in charge of the institution to which Mr. Budd has been sentenced.

***Error Patent Number Two***

Second, our errors patent review reveals that Mr. Budd's sentence is illegally lenient because he should not have received the benefit of parole, probation, or suspension of sentence. That is, the district court found Mr. Budd guilty of committing sexual battery against C.K. and sentenced him under La. R.S.

20

14:43.1(C)(1), which provides that "[w]hoever commits the crime of sexual battery shall be punished by imprisonment, with or without hard labor, *without benefit of parole, probation, or suspension of sentence*, for not more than ten years." (Emphasis added). The district court sentenced Mr. Budd to ten years of hard labor with the Department of Corrections, with two years suspended, with five years of active probation, and with the sentence to run concurrently with any and all other counts. When a district court fails to restrict the defendant's benefits in accordance with the statute or code article serving as the basis for the defendant's conviction, then this constitutes an illegally lenient sentence. *See State v. Hawkins*, 2011-0193, p. 4 (La. App. 4 Cir. 11/16/11), 78 So.3d 293, 296. Because the sentencing hearing transcript and the sentencing minute entry reflect that the district court imposed Mr. Budd's sentence without the restriction of benefits required by La. R.S. 14.43.1(C)(1), Mr. Budd's sentence was illegally lenient.

Regarding situations in which a criminal statute requires imposition of a sentence without benefits, La. R.S. 15:301.1(A) provides:

> When a criminal statute requires that all or a portion of a sentence imposed for a violation of that statute be served without benefit of probation, parole, or suspension of sentence, each sentence which is imposed under the provisions of that statute shall be deemed to contain the provisions relating to the service of that sentence without benefit of probation, parole, or suspension of sentence. The failure of a sentencing court to specifically state that all or a portion of the sentence is to be served without benefit of probation, parole, or suspension of sentence shall not in any way affect the statutory requirement that all or a portion of the sentence be served without benefit of probation, parole, or suspension of sentence.

As the Louisiana Supreme Court explained in *State v. Williams* in interpreting La. R.S. 15:301.1:

> In instances where the restrictions are not recited at sentencing, [La. R.S. art.] 15:301.1(A) deems that those required statutory restrictions are contained in the sentence, whether or not imposed by the

sentencing court. Additionally, this paragraph self-activates the correction and eliminates the need to remand for a ministerial correction of an illegally lenient sentence which may result from the failure of the sentencing court to impose punishment in conformity with that provided in the statute.

2000-1725, p. 10 (La. 11/28/01), 800 So.2d 790, 799. Thus, under La. R.S. 15:301.1(A) and according to *Williams*, "a statute's requirement that a defendant be sentenced without the benefit of parole, probation, or suspension of sentence is self-activating" even when the district court fails to specify this. *State v. Kelson*, 2023-274, p. 13 (La. App. 5 Cir. 12/27/23), 379 So.3d 779, 787 (citing *Williams* 2000-1725, p. 10 (La. 11/28/01), 800 So.2d 790, 799).

For example in *State v. Patterson*, the district court sentenced the defendant as a fourth-felony habitual offender, and his subject felony—felon in possession of a firearm (La. R.S. 14:95.1)—required his sentence be served at hard labor without the benefit of parole, probation, or suspension of sentence. 2016-1104, pp. 7-8 (La. App. 4 Cir. 3/7/18), 241 So.3d 433, 440. On appeal, this Court held that the district court erred in failing to stipulate that the defendant's sentence be served without the benefits of probation, parole, or suspension of sentence; but this Court concluded that under La. R.S. 15:301.1(A) and *Williams*, the defendant's sentence was deemed to have been imposed with the restrictions of benefits even in the absence of the district court delineating them, such that the Court did not need to take any action to correct the sentence. *Id.* at p. 8, 241 So.3d at 440-41.

An illegally lenient sentence can also occur in a case like the matter *sub judice*. Here, the district court did not fail to cite the statutorily-required restriction of benefits at sentencing. Instead, the district court granted benefits to Mr. Budd to which he was not statutorily entitled. Nonetheless, as in *Patterson* and under the self-activating principles found in La. R.S. 15:201.1(A) and *Williams*, we deem

22

that Mr. Budd's sentence was imposed with the restriction of benefits. This is because La. R.S. 15:301.1(A) deems that the statutory restrictions found in La. R.S. 14.43.1 are contained in the sentence no matter what. That is, the requirement that Mr. Budd's sentence be served without the benefit of parole, probation, or suspension of sentence is self-activating because that requirement is contained in the statute under which he was convicted, La. R.S. 14:43.1.

Although the restriction of benefits part of Mr. Budd's sentence is self-activating as we just concluded, under the discretion afforded to this Court by La. C.Cr.P. art. 882(A), we nonetheless remand this matter to the district court to resentence Mr. Budd for the following reasons.[12] In *Gregrich*, the Louisiana Third Circuit Court of Appeal explained that "if correction involves the exercise of sentencing discretion . . . the case must be remanded for the trial court to perform that function." 1999-178, p. 3, 745 So.2d at 696 (quoting *State v. Fraser*, 484 So.2d 122, 124 n.5 (La. 1986)). For example, in *State v. McKinney*, the Louisiana First Circuit Court of Appeal ("First Circuit") reviewed the defendant's conviction for molestation of a juvenile and his sentence of thirty-five years at hard labor (the district court had statutory discretion to sentence the defendant to between twenty-five and ninety-nine years). 2015-1503, p. 13 (La. App. 1 Cir. 4/25/16), 194 So.3d 699, 708. As the First Circuit explained though, the defendant's sentence was illegally lenient because the district court failed to restrict his sentence to at least twenty-five years without the benefit of probation, parole, or suspension of

---

[12] Louisiana Code of Criminal Procedure Article 882(A) provides that "[a]n illegal sentence may be corrected at any time . . . by an appellate court on review." As the Louisiana Third Circuit Court of Appeal explained in *State v. Gregrich*, La. C.Cr.P. art. 882(A) "does not require that an appellate court correct an illegal sentence but provides that the appellate court 'may' correct an illegal sentence on review." 1999-178, p. 4 (La. App. 3 Cir. 10/13/99), 745 So.2d 694, 696.

sentence in accordance with La. R.S. 14:81.2(E)(1) (prior to amendment by 2011 La. Acts No. 67, § 1). *Id.* The First Circuit recognized that the restriction of benefits in the defendant's sentence was self-activating pursuant to La. R.S. 15:301.1(A) and La. R.S. 14:81.2(E)(1). *Id.* However, rather than simply affirming the thirty-five years' imprisonment and explaining that twenty-five years of the imprisonment would be without benefits as required by La. R.S. 14:81.2(E)(1), the First Circuit vacated the defendant's sentence and remanded for resentencing. *Id.* at p. 14, 194 So.3d at 709. As the First Circuit observed, "[i]f the trial court had recognized that this sentence should have contained at least a twenty-five-year restriction on the benefit of parole, it might have imposed a different sentence," such that to "[a]llow[] [La. R.S.] 15:301.1[(A)] to act by operation of law on the illegal sentence in this case would impinge upon the trial court's sentencing discretion." *Id.*

We similarly find that the district court's sentencing discretion is involved here as to the length of Mr. Budd's sentence. That is, the district court found Mr. Budd guilty of sexual battery, and La. R.S. 14:43.1(C) provides that "[w]hoever commits the crime of sexual battery shall be punished by imprisonment, with or without hard labor, without benefit of parole, probation, or suspension of sentence, *for not more than ten years*." Thus, the district court could sentence Mr. Budd to any number of years of imprisonment no greater than ten years as long as Mr. Budd does not receive the benefit of the restrictions per La. R.S. 14.43.1(C). As in *McKinney*, for this Court to find that the restriction of benefits part of Mr. Budd's sentence was self-activating and allow La. R.S.15:301.1(A) to act by operation of law but not give the district court a chance to resentence Mr. Budd would be to impinge on the district court's sentencing discretion. Accordingly, we vacate Mr.

24

Budd's sentence and remand this matter to the district court for resentencing in accordance with La. R.S. 14:43.1(C).

## DISCUSSION

### Counseled Assignment of Error Number Two: Excessive Sentence

Having already discussed the first counseled assignment of error in our errors patent section of this Opinion, we next turn to the second counseled assignment of error. Therein, counsel for Mr. Budd contends that his ten-year sentence for sexual battery is excessive. Because we have already decided in our errors patent review to vacate Mr. Budd's sentence and remand this matter to the district court for resentencing in accordance with La. R.S. 14:43.1(C), we pretermit discussion of this assignment of error as premature.

### Pro Se Assignment of Error Number One: Mr. Budd's Absence for a Critical Stage of the Proceeding

In Mr. Budd's first *pro se* assignment of error, he asserts that the district court erred in ruling on the State's Amended Second Notice to introduce sexually assaultive behavior because he was not present for the hearing. In support of his contention, Mr. Budd cites to La. C.Cr.P. art. 831(4), which states that "a defendant charged with a felony shall be present at all times during the trial when the court is determining and ruling on the admissibility of evidence."

In discussing La. C.Cr.P. art. 831, the Louisiana Second Circuit Court of Appeal has held that a district "court's decision to proceed with trial without the presence of the defendant is subject to abuse of discretion review." *State v. Mayo*, 54,059, p. 5 (La. App. 2 Cir. 11/17/21), 332 So.3d 757, 761 (citing *State v. Lewis*, 51,672 (La. App. 2 Cir. 11/15/17), 245 So. 3d 233). However, we note that in the

matter *sub judice,* the district court's ruling was not made during trial; therefore, contrary to Mr. Budd's assertion, La. C.Cr.P. art 831(4) is inapplicable.

Instead, we look to La. C.Cr.P. art 834, which is titled "When presence of defendant not necessary." It provides in pertinent part: "[t]he defendant has a right to be present, but his presence is not essential to the validity of . . . [t]he making, hearing of, or ruling on a preliminary motion or application addressed to the court[.]" La. C.Cr.P. art. 834(1). The State's Amended Second Notice, in this matter, was a preliminary notice, and Mr. Budd's presence was not required under La. C.Cr.P. art. 834(1). *See also State v. Serrato*, 424 So.2d 214, 224-25 (La. 1982) (holding that there was no error in the district court's "ruling on a preliminary motion outside of the presence of defendant and his attorneys" under La. C.Cr.P. art. 834(1)). Accordingly, we find no error in the district court ruling on the preliminary Amended Second Notice outside the presence of Mr. Budd. This assignment of error has no merit.

## Pro Se Assignment of Error Number Two: District Court's Failure to Grant Mistrial

In Mr. Budd's second *pro se* assignment of error, he asserts that the district court should have granted a mistrial on the grounds of prosecutorial misconduct when the State used evidence of other sexually assaultive behavior through the testimony of his ex-wife, Ms. Gustafson. Mr. Budd's main contention is that because this Court denied the writ regarding the sexual assault of L.W., then the district court erred when it subsequently admitted the testimony of his ex-wife, Ms. Gustafson, and L.W's friend, Ms. Stoltz. Mr. Budd seems to assert that, because this Court denied the State's writ application in *State v. Budd*, 2022-0661 (La. App. 4 Cir. 10/7/22), evidence of the sexual assault of L.W. was not admissible.

26

Additionally, Mr. Budd contends that Ms. Gustafson and Ms. Stoltz should not have been permitted to testify as to L.W.'s sexual assault after this Court had earlier denied the State's writ application. Thus, in his second *pro se* assignment of error, Mr. Budd raises two issues: (1) that the district court erred in not granting a mistrial; and (2) the testimony of Ms. Gustafson and Ms. Stoltz was inadmissible evidence as hearsay. As this Court has previously held, "[a] trial court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion." *State v. Scoggins*, 2010-0869, pp. 10-11 (La. App. 4 Cir. 6/17/11), 70 So.3d 145, 152 (citing *State v. Scales*, 1993-2003 (La. 5/22/95), 655 So.2d 1326).

Addressing the first issue raised by Mr. Budd's assignment of error, we note that defense counsel did not move for a mistrial during trial. Louisiana Code of Criminal Procedure Article 841(A) states:

> An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.

In light of La. C.Cr.P. art. 841(A), the Louisiana Supreme Court has held "[i]t is settled that a new basis for an objection may not be urged for the first time on appeal." *State v. Butler*, 2012-2359, p. 4 (La. 5/17/13), 117 So.3d 87, 89 (citing *State v. Stoltz*, 358 So.2d 1249, 1250 (La. 1978)). Likewise, in *State v. Magrini*, this Court held that "[i]t is well-settled that an irregularity or error, relating to 'the ruling or order of the court,' cannot be availed of after verdict unless it was objected to at the time of occurrence." 2019-0951, p. 25 (La. App. 4. Cir. 5/27/20), 301 So.3d 525, 540 (quoting *State v. Griffin*, 2015-0125, p. 23 (La. App. 4 Cir.

27

9/16/15), 176 So.3d 561, 574). Further, "[a] new basis for objection cannot be raised for the first time on appeal." *Id.* (quoting *Griffin*, 2015-0125, p. 23, 176 So.3d at 575). In *State in the Interest of C.H.*, this Court provided that "[t]he rationale behind the requirement of a simultaneous objection as found in [La. C.Cr.P.] art. 841(A) is that the contemporaneous objection provides the trial court with an opportunity to rule on the issue and to cure or prevent a potential error." 2021-0516, p. 18 (La. App. 4 Cir. 1/26/22), 335 So.3d 451, 462 (citing *State v. Hampton*, 2019-0682, p. 13 (La. App. 4 Cir. 7/1/20), 302 So.3d 544, 551). Additionally, "[a] failure to move for mistrial is a waiver of the error" because "a motion by defendant" is required. *State v. Grant*, 531 So.2d 1121, 1123 (La.App. 4th Cir. 1988).

In the matter *sub judice*, Mr. Budd did not move for a mistrial during trial. Rather, when L.W.'s friend, Ms. Stoltz, testified at the trial, defense counsel lodged a hearsay objection, but defense counsel did not move for a mistrial when the district court allowed Ms. Stoltz's testimony. The district court was not given the opportunity to consider a motion for a mistrial. Considering that Mr. Budd is raising the issue of a mistrial for the first time on appeal, this Court cannot consider his claim regarding a mistrial because this assignment of error was not preserved for appeal.

Next, we address the second issued raised by Mr. Budd's second *pro se* assignment of error. Mr. Budd alleges that the district court erred in admitting evidence which he considers to be inadmissible under La. C.E. art. 412.2, which pertains to "Evidence of similar crimes, wrongs, or acts in sex offense cases." We also note that Mr. Budd asserts the same testimony is inadmissible because it is hearsay. As noted previously, Mr. Budd contends that district court erred when it

28

subsequently admitted the testimony of his ex-wife, Ms. Gustafson, and L.W's friend, Ms. Stoltz, after this Court denied the writ application regarding the sexual assault of L.W.

A review of the record reveals the district court allowed the State to proceed with the Amended Second Notice after this Court's writ denial. At the time of the evidentiary hearing, Mr. Budd's counsel did not object to the admission of Ms. Gustafson's and Ms. Stoltz's testimony under La. C.E. art. 412.2 because the State provided defense counsel with the Amended Second Notice, which defense counsel stated, "complie[d] with the requirement of 412.2." Thereafter, the district court found that the evidence of the sexual assault of L.W. was admissible. On appeal, Mr. Budd cannot assert an objection on a different basis when he did not make this objection at the district court. He did not object to the testimony regarding L.W.'s assault under La. C.E. art. 412.2; instead the basis of his objection was hearsay. The district court must have an opportunity to consider the motion and rule on the motion to cure a potential error. Mr. Budd needed to make his objection as to La. C.E. art. 412.2 known to the district court in order to preserve the objection for appeal. As previously stated, this Court has held that under La. C.Cr.P. art. 841, "[a] new basis for objection cannot be raised for the first time on appeal." *State in the Interest of K.B.*, 2023-0409, p. 36 (La. App. 4 Cir. 9/26/23), 372 So.3d 864, 878 (alteration in original) (quoting *State in the Interest of C.H.*, 2021-0516, p. 18, 335 So.3d at 462).

At the trial, during the testimony of both Ms. Gustafson and Ms. Stoltz, Mr. Budd's counsel objected on the basis of hearsay. In response to defense counsel's hearsay objection, the district court instructed the State to finish with the witness,

recognized that it already heard hearsay testimony from another witness, "but it was not going to hear this hearsay over and over."

When an "objection was sustained, defendant has no complaint on appeal unless he requested and was denied an admonition to disregard or mistrial." *State v. Robinson*, 506 So.2d 797, 798 (La. App. 1st. 1987) (citations omitted). This Court has explained that "[w]hen a defendant's objection is sustained, however, and the court is presumably willing to give him whatever relief to which he is entitled," and thus, the defendant cannot appeal unless he was denied a requested mistrial. *State v. Grant*, 5313 So.2d 1121, 1123 (La. App. 4th Cir. 1988). The Louisiana Fifth Circuit Court of Appeal has reiterated in a case considering alleged inadmissible hearsay, "[i]f an objection is sustained, the defendant cannot on appeal complain of the alleged error unless at the trial level." *State v. Sly*, 2023-60, p. 57 (La. App. 5 Cir. 11/2/23), 376 So.3d 1047, 1090 (citing *State v. Rodriguez*, 2002-334 (La. App. 5 Cir. 1/14/03), 839 So.2d 106, 136, *writ denied*, 1993-0482 (La. 5/30/03), 845 So.2d 1061, *cert. denied*, 540 U.S. 972, 124 S.Ct. 444, 157 L.Ed.2d 321 (2003)).

Here, both objections were sustained, the witnesses continued their testimony after objections, and no subsequent mistrial objection was made by defense counsel. Considering that the district court sustained defense counsel's hearsay objections, and defense counsel failed to move for a mistrial, Mr. Budd cannot raise this issue on appeal. However, even with the testimony continuing after the district court sustained the objections, we find this was harmless error.

## CONCLUSION

For the foregoing reasons, we vacate Mr. Budd's sentence and remand this matter for resentencing in accordance with La. R.S. 14:43.1(C)(1). We further

remand for the purpose of correcting the minute and docket master entries, as well as the sentencing commitment order, to reflect that the defendant was convicted of sexual battery, a violation of La. R.S. 14:43.1(A)(1). We order that the district court instruct the Clerk of Criminal District Court to transmit the corrected documents to the officer in charge of the institution to which Mr. Budd has been sentenced.

**SENTENCE VACATED; REMANDED FOR RESENTENCING**